# JANUARY TERM, 1866, AT LANSING.

## Patrick Britton v. William M. Ferry and Eliza Stuart.

*United States Survey. Quarter Posts, effect of as monuments. Construction.*—When the actual location of the quarter post, in a United States survey, is capable of being ascertained with certainty, and it appears that the actual distance from one point to another, on a section line, is greater than is indicated by the original survey; it was *held*, that the quarter posts were authorized to be set and established by virtue of the land laws, and survey statutes, taken in connection with the instructions of the department at Washington to the surveyors; and that when so set, they constitute established monuments of boundary; and as such, will govern in preference to the boundaries by courses and distances; and that this was the construction which had always been given to the laws, by the department at Washington, and by the Supreme Court.

*Heard November 7th, 8th and 9th,* 1865. *Decided January 5th.*

Error to Kent Circuit.

This was an action of ejectment brought by William M. Ferry and Eliza Stuart, defendants in error, for the recovery of certain premises, in section thirty-six, in township seven north, of range twelve west.

With the plea of the general issue the defendant below filed the following notice:

*"To plaintiff's attorneys:*

"Take notice, that on the trial of this cause, the defendant will give in evidence, and insist, under the above plea of the general issue:

"That the United States of America originally caused to be made a survey of a certain tract of land in the county of Kent and State of Michigan, now known and designated by refer-

-ence to such survey, as section thirty-six, in town seven north, of range twelve west, and that in surveying out and establishing the north line of so much of said section as lies south of Grand River, it established the quarter stake on said north line at a point which is forty-five chains west of the north-east corner of said section;

"That one Elijah Grant, (now deceased,) late of the county of Washtenaw, in said State of Michigan, became the purchaser of said United States of the north-east quarter of said section thirty-six;

"That the north boundary line of the same commences at the north-east corner of said section thirty-six, and extends by the original survey aforesaid westerly on the north line of said section to the quarter stake, a distance of forty-five chains, or thereabouts;

"That the west boundary line of said north-east quarter commences at the quarter stake last named, and runs southerly in the direct line of the quarter stake on the south line of said section forty chains, or thereabouts;

"That the only occupation by said defendant of any land upon said section thirty-six is within the boundaries above named, and that his right to occupy he derives from one Raymond O'Hara, who is his landlord, and that the ownership of the premises so occupied by him is in the said O'Hara, by a title originally derived through said Elijah Grant, deceased.

"Yours, &c.,

"MILLER & ROGERS, defendant's attorneys." ·

The cause was submitted to the jury under the charge of the court.

The defendant requested the Circuit Judge to charge the jury as follows:

That the stakes and points designated and made in the government survey as boundaries of divisions and sub-divisions of sections, when ascertained and proved, control courses and distances, and must prevail; which charge was refused and excepted to.

The Circuit Judge then charged the jury as follows:

1st. "That the law of Congress does not require the setting of quarter posts, so called, in section lines on the ground."

2nd. "That in case of regular sections, they are sub-divided according to law, by lines protracted on the plat from points in the section lines, equi-distant from those two corners which stand on the same line."

3rd. "That in case of fractional sections, the sub-divisions are to be made by law by lines protracted on the plat from north to south, or east to west, so as to make as many one-half quarter sections as practicable."

4th. "That quarter posts, so called, placed on section lines by surveyors, are not such fixed, definite and established points as to conclude parties, or determine boundaries."

5th. "That in case of fractional sections which must be sub-divided according to law as above stated, an act of a surveyor fixing or settling a quarter post at any other point than that where a due north and south line, (as in this case,) drawn from the proper point on the opposite line would strike this line is void, and such act of the surveyor cannot be paramount to, or override the law."

6th. "That the settled policy of Congress has been to divide the public lands in square or right angled figures, and not by lines forming oblique or acute angles."

To which said instructions and charges the counsel for the said defendant did then and there except.

Judgment having been rendered for the plaintiffs, defendant brought error.

*Miller & Rogers* and *Joslin & Blodget* for plaintiff in error.

The only questions for the consideration of this court are the correctness of the decisions of the Circuit Judge in his charge to the jury.

1st. We insist that by the law a quarter post, once placed and witnessed by the United States surveyor, can only be changed by the government, and that before the land is sold.

2nd. That any monument overrides courses and distances. 5 *Mass.* 355; 6 *Id.* 131; 19 *Pick.* 445; 2 *N. H.* 197 *and* 287; 6 *Wheaton,* 580; 7 *Id.* 7; 6 *Peters,* 328.

3rd. Lines must be held as they were run, not as they ought to have been run. *Wright, Ohio,* 171, 576, 599; 1 *Doug. Mich.* 19, 29; 4 *McLane,* 268; *Acts of Congress,* 1805, 1820; *Opinions of Com. of Land Office;* 24 *Ala.* 391; 2 *Porter, Ala.* 38; 24 *Ala.* 521; 7 *Porter, Ala.* 428; 5 *Dana, Ky.* 543; 1 *Shepley, Me.* 329; 2 *Shepley, Me.* 66; 10 *Ohio,* 163; 2 *App. Me.* 205; *Wright,* 634; 3 *Harr. Del.* 88; 1 *Gratt. Vir.* 211; 1 *Richardson, S. C.* 491; 16 *Ga.* 141; *Addison, Penn.* 359.

4th. Quarter section lines are not run, but quarter section corners are found and marked by the surveyor, and when marked, are not to be moved after the sale, without the consent of the owners.

5th. A line, corner or post, made for the inspection of buyers, or shown them by the grantor, is binding upon the parties. 2 *N. H.* 303.

*George Gray* for defendants in error.

The principal question in this case is:—If a deputy surveyor, in sub-dividing a fractional township of the public lands of the United States, in the year 1831, set a quarter stake, so called, in a fractional section line of that township, does that act of the surveyor fix and determine absolutely and conclusively, as between the owners of the contiguous subdivisions of the section, the corners and boundaries of such subdivisions, however erroneous that act of the surveyor may be?

The defendants in error hold the negative of this question.

The certified copy of the plat, which is part of the record, shows that the east and south lines of section thirty-six are regular; that the west and north lines are fractional; and that the entire of the fractional section contains three full quarter sections of 160 acres each, and a fractional quarter section of 120 72-100 acres. The east and south lines are also township lines.

The plaintiff in error claims that the deputy surveyor, in running the north line of the township, set in said line a "quarter stake," so called, at a point which is about forty-five (45) chains west of the north-east corner of said section 36, being about twenty (20) rods west of the point where the north-west corner of the north-east quarter of said section is shown to be by the plat. The land lying south of, and adjoining to, these twenty rods is that in controversy.

The defendants in error claim that even if the deputy surveyor set a stake, as and for a "quarter stake," so called, forty-five chains west of the north-east corner of said section, (as to which there was contradictory testimony,) such act of the surveyor did not, and does not, establish the corner, or determine the boundary between the north-east and north-west quarters of the section; that such act was, and is wholly unauthorized by law, and of no force or effect; and that the boundary line between said quarter sections is, and should be, a line drawn from the center of the south line of the section due north, as shown on the plat.

1. The acts of Congress do not authorize, or require, the setting of "quarter stakes," so called, or the designation, in any manner, on the ground, of the corners or boundaries of subdivisions of a section, other than section corners and section lines.

(The various acts of Congress were cited and commented upon by counsel.)

Up to 1805, no law of Congress had ever been passed, and no provision adopted, for running or marking any line or corner of a tract or parcel of the public lands less than a section, (except in the case of certain half sections,) and that section lines and section corners were also lines and corners of the respective subdivisions of the sections.

In the case of sections the Government has arranged their boundaries, and marked their lines and corners; but in the case of *subdivisions of sections*, their lines and corners are to be ascertained and determined by lines protracted and drawn

14 MICH.—H.

on the plat according to the principles and in the manner spe-
cified. — 3 *How, U. S. Sup. Court,* 650 ; *See dissenting
opinion of Judge Catron* ; 2 *Porter,* 38.

So far as township and section lines and corners are concern-
ed, where they are actually run and marked, so are they es-
tablished and held to be ; because 1st, the act of so running
and marking such lines and corners was by authority of law ;
and 2d, on each section line and corner, and on each township
line and corner, depend all the remaining sections in the town-
ship and all the remaining townships in the district. Such is
not the case in respect to subdivisions of sections ;—their cor-
ners or lines are not required by law to be marked on the
ground, and an error of any kind therein can only affect the
contiguous subdivisions of the same section.

2. Fractional sections containing over 160 acres are subdi-
vided, according to law, by lines running due north and south
or east and west; and any other subdivision is contrary to
law and void.

As before stated, previous to the act of 1820 fractional sec-
tions could only be sold entire and were never subdivided.
See *act* 1796, *sec.* 2, *act of* 1804, *sec.* 9, and opinion of Judge
Catron, before cited. So the act of 1805 had no reference to
a subdivision of a fractional section. There was then no such
thing in existence or in contemplation of law.

The lines, then, must be due north and south, or east and
west. Such is the requirement of the act of Congress. Even
the word " northerly," or " northward," in a patent means a
line due north.—3 *Caines,* 293 ; 1 *Johns.* 156.

The act of the surveyor was not only unauthorized by law,
but was in violation of law.

3. A stake is too frail a witness to be called a monument, or
to control the construction of a deed.—33 *Penn. St. R.* 124.

The monuments which control course and distance must not
only be called for in the deed, but must be therein referred to
as indicating and identifying the land. The monuments called
for in a deed, that control course and distance, are those

which are fixed on, and understood by, the parties, as indicating and identifying the premises. Such are not the facts in the case before the court; the only indications or identifications of the land in controversy are the section lines and corners, the Government plat, and the rules and principles of law; nor are any others fixed on and understood by the parties. Purchasers of subdivisions of the public lands buy from, and according to, the plat; and it is only by the plat and subdivision lines marked thereon that the government sells. (See Judge Catron's opinion before mentioned.) The government recognizes no indications or identification of the corners, boundaries, or contents of the *subdivision of sections*, other than the plain rules of law.

4th. The rule that monuments control is general and not universal. Cases are found where the calls for monuments are disregarded, and the course and distance govern, and this is entirely consistent with the reason of the rule and with the rule itself.—17 *Mass.* 207; 16 *N. Y.* 359.

The principle and the law is this—" That which is most material and most certain shall control that which is less material and less certain."—1 *Cow.* 612; 5 *Id.* 371; 18 *Johns.* 81.

Applying this principle to the present case it must be held that the Government plat and the acts of Congress will control.

COOLEY J.

The defendants in error brought ejectment to recover lands which they claimed constitute a part of the east half of the north-west quarter of section thirty-six, in township seven, north of range twelve west. The only question involved in the case is, whether this claim is valid, or whether, on the other hand, the lands in dispute are a part of the north-east quarter of the same section, as claimed by Britton.

The section in question was made fractional by the Grand River crossing the north-west quarter, leaving the other three quarters regular. The survey was made by the United States

district surveyor in 1831.  The field notes show the survey of
the east and south boundaries of the section, and the setting
of half mile and mile posts at forty and eighty chains, respec-
tively, from the south-east corner of the section; they also
show the setting of a half mile post on the north line of the
section, forty chains from the north-east corner, and a continu-
ation of that line to the river four chains and fifty-nine links
from the half mile post; and also the setting of a half mile
post on the west line of the section, forty chains from the
south-west corner, and a continuation of that line eighteen
chains and eighty-five links to the river.  At the time this sur-
vey was made, the opposite bank of Grand River was Indian
territory, and it was not surveyed until 1837, when the section
was completed by surveying out the fraction on the opposite
side of the river, and fixing the north-west corner post.

   The controversy in this case springs from the fact that the
actual distance from the north-east corner of the section to the
river, on the north line of the section, is some five chains more
than is indicated by the original survey; and the half mile
post, instead of being forty chains from that corner, is stated
on the argument to be about forty-five chains.  Assuming
that the actual location of that post is capable of being ascer-
tained with certainty, the question presented for decision is,
whether the post is to govern in fixing the line between the
north-east and north-west quarters of the section, or whether
the north-east quarter is at all events to be made a half mile
square, without regard to the actual location of the half mile
post, leaving any surplus that may exist to fall within the
lines of the north-west fractional quarter.  The Circuit Judge
held that the half mile post, or as it is more commonly called,
the quarter post, was not such a fixed and established boun-
dary as could conclude the parties; that there was no law,
when the survey was made, requiring the surveyor to set it,
and that a proper construction of the land laws would give
the purchasers of the north-east quarter a half mile square
only, without regard to any post thus fixed without authority

to indicate a division line between the two north quarters of the section.

It would be difficult to overrate the importance of this ruling if it should be sustained by the court. It is conceded by the defendants in error that the general impression of the law is adverse to it; and it cannot be denied that boundary lines, in this State at least, have generally been established by accepting the quarter posts as fixed and established monuments, not liable to be changed for errors in the original surveys. A decision which should unsettle this general belief would lead to endless difficulty, discussion and litigation, and should not be made, unless a careful examination of the law irresistibly forces us to the conclusion that it is correct.

The statutes for the survey of the public lands begin with the act of 1796, (1 *Stat. at large*, 464; 1 *Land Laws*, 50,) which required that they should be divided by north and south lines, run according to the true meridian, and by others, crossing them at right angles, so as to form townships of six miles square, unless where the line of the then recent Indian purchase, or of tracts of land theretofore surveyed and patented, or the course of navigable rivers, might render it impracticable; and then the rule was to be departed from no further than the peculiar circumstances should require. The corners of townships were to be marked, with progressive numbers from the beginning, and each distance of a mile between the corners was also to be distinctly marked. Each alternate township was then to be sub-divided into sections of six hundred and forty acres each, by running through it, each way, parallel lines at the end of every two miles, and by marking a corner on each of the said lines at the end of every mile. Fractional parts of townships were to be divided into sections in the same manner, and fractions of sections were to be annexed to and sold with adjacent entire sections. This act made no provision for the sub-division of sections, or for any posts, except at section corners; and the townships not sub-divided were only authorized to be sold in quarter townships.

The amendatory act of 1800 (2 *Stat. at large*, 73; 1 *Land Laws*, 73,) provided for the sub-division of the alternate townships west of the Muskingum, not sub-divided under the original act, into half sections of three hundred and twenty acres each, by running parallel lines through the same from east to west, and from south to north, at the distance of one mile from each other; and marking corners at the distance of each half mile, on the lines running from east to west, and at the distance of each mile on those running from south to north. The townships lying east of the Muskingum, not before subdivided, were all to be sub-divided under this act into sections. All excesses and deficiencies in townships were to be added to, or deducted from, the western or northern ranges of sections or half sections, which were to be sold as containing only the quantity expressed in the returns and plats, while all others were to be sold as containing the complete legal quantity. Thus it appears that under this law half mile posts were to be established on the east and west lines of a portion of the public surveys, and the act evidently contemplated that these posts were to govern purchasers, and the amount of land within the boundaries they indicated was to be taken as the real amount, whether in point of fact it was so or not.

The act of 1804 (2 *Stat. at large*, 281; 1 *Land Laws*, 104,) authorized sales in quarter sections, not only of the whole, but of the fractional sections (§ 12); and the half and quarter sections sold were to be surveyed out by deputy surveyors, at the expense of the purchasers, whenever necessary to ascertain the boundaries or true contents. It can hardly be doubted that half mile posts, set under the two acts last mentioned, would be lawfully established monuments of boundary.

We now come to the act of 1805, (2 *Stat. at large*, 313; 1 *Land Laws*, 119,) "concerning the mode of surveying the public lands of the United States," which is the parent of our present general system. The first section provides, that the Surveyor General shall cause all those lands north of the river Ohio, which by virtue of the act of 1796 were sub-

divided by running through the townships parallel lines each way at the end of every two miles, and by marking a corner on each of the said lines at the end of every mile, to be subdivided into sections, by running straight lines from the mile corners thus marked, to the opposite corresponding corners, and by marking on each of the said lines intermediate corners, as nearly as possible, equi-distant from the corners of the sections on the same. He was also to cause the boundaries of all the half sections which had been purchased previous to July 1, 1804, and on which the surveying fees had been paid, to be surveyed and marked, by running straight lines from the half mile corners before marked, to the opposite corresponding corners; and intermediate corners were at the same time, to be marked on each of the dividing lines as nearly as possible, equi-distant from the corners of the half section on the same line. Under this section, quarter posts would be established in each alternate township surveyed under the act of 1796, and also in each other township, where sales had been made, and surveys paid for.

Section two of the act of 1805 proceeded to lay down general rules for ascertaining the boundaries and contents of the several sections, half sections, and quarter sections, of the public lands of the United States, as follows:

1st. "All the corners marked in the surveys, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to designate; and the corners of half and quarter sections, not marked on the said surveys, shall be placed as nearly as possible, equi-distant from those two corners which stand on the same line."

2d. "The boundary lines actually run, and marked in the surveys," "shall be established as the proper boundary lines of the sections or subdivisions for which they were intended;" "and the length of such lines shall be held and considered as the true length thereof. And the boundary lines which shall not have been actually run and marked as aforesaid, shall be ascertained by running straight lines from the established

corners to the opposite corresponding corners; but in those portions of the fractional townships, when no such corresponding corners have been or can be fixed, the said boundary lines shall be ascertained by running from the established corners, due north and south, or east and west lines, as the case may be, to the water course, Indian boundary line, or other external boundary of such fractional township."

3d. "Each section or subdivision of a section, the contents whereof shall have been, or by virtue of the first section of this act, shall be returned," "shall be held and considered as containing the exact quantity expressed in such return or returns; and the half sections, and quarter sections, the contents whereof shall not have been thus returned, shall be held, and considered, as containing the one half or the one fourth part, respectively, of the returned contents of the section of which they make part."

It is contended by the defendants in error, that up to this time there was no provision of law for setting quarter posts, except in the special cases provided for by section one of this act; while under the general system which the act establishes, monuments were to be fixed only at the section corners, and the corners of half sections and quarter sections were only to be placed and marked on the plat in the office, after the surveys were returned. The placing of a quarter post in the field, it is argued, was therefore an unauthorized act of the surveyor, which could bind neither the government, nor the patentees.

When this position was assumed on the argument, difficulties suggested themselves to our minds, which at the time appeared insuperable, and which have not been removed by the argument.

*First.* It was conceded that *section corner* posts were, under this act, to be set and established in the field, and that when set, they were conclusive upon purchasers, and not liable to be removed on discovery of errors after sales. But

this act no more provides for section corner posts, than it does for quarter posts; and the same construction which would make the latter unauthorized, would render the other so likewise.

*Second.* The argument makes the words "subdivisions of sections," as used in the first subdivision of section two, meaningless; since if only the corner posts of sections were to be established, those corner posts must necessarily be the corner posts also of the subdivisions of sections, cornering at them, and a declaration to that effect would be worse than idle, because being useless for that purpose, its tendency would be to mislead by enticing into inquiries after some sufficient reason for the words being employed. And, independent of this consideration, it seems evident to us, that corners of sections and of subdivisions of sections are here spoken of, in contradistinction to each other, and not as indicating the same points.

*Third.* It was the evident purpose of this act, as we think, to adopt and make conclusive the general system of surveying which should be established under it; and to fix the corners established in the field, as well of the subdivisions of sections, as of the sections themselves, and make them permanent boundary monuments, not subject to change on discovery of errors, after private rights had intervened. The act proceeds upon the well understood fact, that however carefully a law may give directions, and the department seek to carry them out, absolute correctness in the surveys will not, and cannot be attained, and that it is better for both the government and the purchaser to assume this fact at the outset, and be governed by fixed monuments, instead of leaving everything open to change in the future, when new and more careful surveys might be practicable. The act therefore declared that the corners of sections and subdivisions of sections established in the field, should be "established" as the proper corners of the sections and subdivisions of sections they were intended to designate; and to make clear, beyond doubt, the

14 MICH.—I.

intention that they should not be subject to removal, it also provided, that the contents of each section, and subdivision of a section, as returned, should be held and considered as the true contents, or in other words, should not be open to inquiry between the government and purchasers, or between the purchasers themselves.   Mr. Gallatin, Secretary of the Treasury, in speaking of this act in an official communication to the surveyor at Washington, Mississippi Territory, immediately after its passage, says: "The principal object that Congress have in view is, that the corners and boundaries of the sections and subdivisions of sections, should be definitely fixed; and the ascertainment of the precise contents of each is not considered as equally important.   Indeed it is not so material, either for the United States, or for the individuals, that purchasers should actually hold a few acres, more or less than their surveys may call for, as it is that they should *know with precision, so as to avoid any litigation, what are the certain boundaries of their tract.*"—2 *Land Laws*, 787.

*Fourth.* The argument assumes that Congress, for no visible reason, established a system which included quarter posts for the townships partially surveyed before, and a different system, which omitted those posts, for the public lands generally.

*Fifth.* But it is a consideration which at this period of time cannot be overlooked, that the proper department has put a construction upon this statute which will forbid adopting the argument, unless we are prepared to disregard a settled practice of sixty years, and accept a rule which, by taking from quarter posts their authority, opens the floodgates to the very evil which Mr. Gallatin supposed the act of 1805 had provided against.   This construction of the department is best expressed in a letter from the Commissioner to the Surveyor General of Mississippi, July 20, 1831, (2 *Land Laws*, 915,) in which he says: "The following is a summary of [its] regulations.   The lands are to be laid off in townships of precisely six miles square, by lines running due north and

south, and east and west. On each of those lines, precisely at the distance of one mile apart, corners are to be established for sectional lines. Parallel lines are to be run through the tpwnship each way, from each sectional corner to the corresponding sectional corner on the opposite side of the township; on each of which lines sectional corners are to be established at the distance of one mile apart; which process will divide the township into thirty-six sections. In running the exterior township lines, and also the interior sectional lines, *intermediate half mile posts, or corners,* [precisely equi-distant between the corners of the sections,] *are to be established as the boundaries of quarter sections.*" It is true that this construction has not the force of law; but as it was adopted immediately after the passage of the act, and has been adhered to ever since, the reasons for now repudiating it should be most cogent and conclusive, before we are warranted in accepting them.—*Surgett v. Lapice et al.,* 8 *How.* 68; *Bissell v. Penrose,* 8 *Id.* 336.

The various statutes up to and including that of 1805, are not specific in regard to fractional sections; and it is claimed by defendants in error, that no authority existed for their sale in subdivisions, until the passage of the act of 1820 :—[3 *Stat. at large,* 566; 1 *Land Laws,* 323]. That act provided that "all the public lands of the United States, the sale of which is or may be authorized by law, shall, when offered at public sale to the highest bidder, be offered in half quarter sections; and when offered at private sale, may be purchased, at the option of the purchaser, either in entire sections, half sections, quarter sections, or half quarter sections; and in every case of the division of a quarter section, the line for the division thereof, shall run north and south, and the corners and contents of half quarter sections, which may thereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the second section of the act [of 1805]; and fractional sections, containing one hundred and sixty acres or upwards, shall in like manner, as

near as practicable, be subdivided into half quarter sections, under such rules and regulations as may be prescribed by the Secretary of the Treasury," etc.

Under this act the Secretary of the Treasury issued instructions to Surveyors General, that they should divide the fractional sections, containing more than one hundred and sixty acres, into half quarter sections, by north and south, or east and west lines, so as to preserve the most compact and convenient forms. They were not required, however, to run the subdivisional lines and mark them, but merely to mark them upon their surveys, and calculate the quantity of land in each subdivision.

Starting with the position that the fractional sections were not to be subdivided for sale under the act of 1805, or quarter posts established, the defendants in error insist, that the only mode in which subdivisions could be made under the act of 1820 was, "by lines protracted on the plat, running to the cardinal points." Taking the fractional section now in controversy as an illustration, the division line between the two north quarters could not be ascertained, it is said, by the principles of the act of 1805, because the section had no north west corner, and it would consequently be impossible to find a point equi-distant between the north east and north west corners, from which to draw a line to another point equi-distant, between the south east and south west corners. Precisely the same difficulty would occur in dividing the section north and south.

If in fact quarter posts were established in the case of fractional, as well as regular sections, and their establishment was not absolutely without authority, this argument can have no force. That they were actually set by the surveyors is conceded; that they bind the purchasers from government is denied; and we are referred to cases which are supposed to hold, that the surveyors had no authority for setting them. Indeed it is suggested that, even if authorized, such a post is not a monument of such fixed and definite character, as can

be allowed to control course, distance, or quantity in a grant; but this point was not seriously pressed, and is clearly opposed to the adjudged cases. See *McCoy's Lessee v. Galloway*, 3 *Ohio*, 282; *Alshire's Lessee v. Hulse*, 5 *Ohio*, 536; *Hall v. Davis*, 36 *N. H.* 569; *Richardson v. Pickering*, 41 *Id.* 380; *Younkin v. Cowan*, 34 *Penn. St.* 198; *Wharton v. Garvin*, *Id.* 340; *Billingsley v. Bates*, 30 *Ala.* 376; *Climer v. Wallace*, 28 *Mo.* 556; *Moreland v. Page*, 2 *Clarke*, [*Iowa*] 139; *Sargent v. Herod et al.*, 3 *Id.* 145; *Stewart v. Boyd*, 15 *La. An.* 171. We must therefore see whether the authorities justify us in holding that the setting of quarter posts by the United States Surveyors was unauthorized, and consequently without legal force.

The case mainly relied upon, on this point, is *Brown's Lessees v. Clements*, 3 *How.* 650. We have carefully examined that case without being able to find in it any support for the position taken; and we think the opposite doctrine is very clearly to be deduced. It there appeared, that in a case where a fractional section, containing over one hundred and sixty acres, was capable of being subdivided, so that the south west quarter would have been full and of regular form, the surveyor disregarded entirely the law and instructions which required that he should subdivide into regular half quarter sections, and made an arbitrary division of the whole section into two lots, in a manner entirely unauthorized. The regular half mile posts were, however, set on the south and west sides of the section; and a patent was issued to one claimant, designed, perhaps, to convey the west lot as surveyed, but describing it as the *south west quarter* of the section. The Court held the division by the surveyor to be illegal, and that the patent conveyed the complete quarter section of one hundred and sixty acres. The precise question now before us was not presented by that case, but in discussing it, remarks were made incidentally, which are supposed to show that the Court accepted the view now pressed upon us. The remarks lead us to a different conclusion. Justice

McKinley in delivering the opinion of the majority of the Court, speaking of the general system of surveys, said: "None of the lines, subdividing sections, are required to be made by actual survey and marked on the land," which is strictly correct; and it is also true that they are not run in fact. He further says: "When the township and section lines are run, and *the corners marked according to law*, the quarter section lines are ascertained on the plat, by protracting lines across the sections, north and south, and east and west, equidistant from the section lines," &c. If the learned Justice in speaking of "corners marked according to law," referred to no other corners than those made by the intersection of township and section lines, the mention was entirely unnecessary, as his meaning was fully expressed without it.

But any argument based upon such a mere incidental remark must necessarily be exceedingly uncertain and dangerous. And by a reference to the argument of counsel in that case (p. 659), it will be seen that it rests to a considerable extent upon the fact that quarter posts *were actually set and established.* The argument was: The south west corner and the half mile posts were all marked. "There were three corners established then, and any one could run the fourth line; and the fact of the case is that these section lines are the only ones which are ever run. · The system was adopted in 1805. Under it quarter sections could be found without being run out, *because half mile posts were put down.* The law, then, creates this quarter section, which was established as soon as the posts were planted." It appears to us that this argument was substantially accepted by the court as a correct exposition of the statutes providing for surveys; and it is a full recognition of the correctness of the construction put by the department upon the act of 1805.

In the more recent case of *Lindsey et al. v. Hawes, 2 Black,* 554, the Supreme Court of the United States still more distinctly recognize and sustain the same construction as applied to fractional sections. In that case, a preemption right was

claimed in the fractional south west part of a section, and the question was, whether, after a survey had been once made, and the quarter posts set, and such a possession had been taken of a subdivision as would entitle the possessor to preemption rights, the surveyor might lawfully correct the survey and so move the line as to leave the occupant off the fraction. The Court held that he could not; and in the decision they fully recognize the practice of setting the quarter section posts, and hold that when once set, and individuals have acquired rights by reference to them, they are not subject to change.

This decision should be conclusive on the point; especially as it is not unreasonable, and sanctions the practice of the department. We all know that when purchasers take lands from the General Government, they ascertain the boundaries by going upon the land and tracing out the lines and stakes. No one supposes that if an error shall chance to have occurred in the survey, he is liable to have the corner post removed, and perhaps the portion of his purchase, which he regarded as most valuable, taken from him by a re-survey. The corner he looks upon as a fixed point; and it is only where no stake has been set, or corner designated, that he resorts to measurement to ascertain where the line will come. A post set which was to govern nothing, but to be itself controlled by course, distance and quantity, would not only be useless, but in the majority of cases would tend to deceive and invite litigation; and the purchaser is therefore warranted in inferring that it would not be set, except as a permanent monument. If every fractional section were subject to correction by subsequent surveys, the purchase of the north west fraction would commonly be a mere lottery; since in the final correction all errors must be thrown upon that, and instances would occur where it would be wholly swallowed up in the other subdivisions, while in other cases it would be doubled in extent.

We are of opinion that the Circuit Judge erred in his ruling, and that the judgment should be reversed.

CHRISTIANCY J. concurred.

CAMPBELL J. If the matter had not been settled by authority, I am not satisfied that the statute would require the construction put upon it by my brother Cooley, although I think it at least admissible, but the decisions referred to, from the Supreme Court of the United States, are conclusive, and I therefore concur in the results he has arrived at.