## Case No. 13,735.

### TALCOTT v. PINE GROVE.

### TAYLOR v. CITY OF BATTLE CREEK.

[1 Flip. 120; 1 Bench & Bar (N. S.) 50.] [1]

Circuit Court, W. D. Michigan. Jan. 16, 1872. [2]

COURTS — FOLLOWING STATE DECISIONS — STATE CONSTITUTION—TAXATION—RAILROAD COMPANIES—MUNICIPAL AID.

1. Where the decision of the highest court of a state holding an act of the legislature unconstitutional is not based upon any provision of the state constitution, but upon certain general

1 [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 1 Bench & Bar (N. S.) 50, contains only a partial report.]
2 [Affirmed in 19 Wall. (86 U. S.) 666.]

principles applicable alike, if correct, to all the state governments, and that of the United States, the United States courts are not bound to follow such decision.

2. Where such decision of the state court is based upon special provisions of the state constitution, it will be followed by the United States courts as to all matters arising subsequent to the state decision.

3. But where contracts have been made in good faith, based upon state laws, which have long been treated as valid by successive public officers of the state, and by the people of the state generally, and where the prior judicial decisions of the state upon cases analogous in principle, though not upon the precise point, favor such validity, the United States courts, in suits upon such contracts, will not, contrary to their own judgment, follow state decisions holding such laws unconstitutional and such contracts invalid.

4. Laws authorizing municipal aid to railroads are not in conflict with the constitution of Michigan. The decisions of the supreme court of the state holding the opposite view were so contrary to precedent and so unexpected as to operate as a surprise upon the community. The long-continued and frequent legislative action in the passage of such laws, and of other laws involving the same principles, with the action of the state and municipal officers in favor of their validity, and the repeated decisions of the supreme court of the state announcing principles which support such laws, together constituted such evidence that these laws would be held constitutional, that business men were justified in making contracts in reliance upon their validity; and the United States courts will enforce all such contracts brought before them whenever made before the state decisions. In construing contracts made subsequent to the state decisions, they will follow those decisions, irrespective of their own views,

5. The supreme court of the United States have repeatedly held that, in the absence of some provision in the state constitution prohibiting it, the legislature has power to authorize municipalities to issue bonds in aid of railroads designed to benefit the public interests of the community.

6. The decision of the supreme court of Michigan against the validity of these bonds is opposed to an overwhelming weight of decisions in other states with constitutions similar to that of Michigan. Before the constitution of Michigan was adopted, in 1850, the validity of bonds of this character had been settled in states with similar constitutions. In adopting its own constitution, Michigan must be presumed to have adopted the practical and judicial construction of other like constitutions.

7. A railroad corporation, in view of its origin, objects, uses, and the control of government over it, is a public corporation, though its shares may be owned by private individuals. It is a governmental agency for public purposes.

[Cited in Schofield v. Lake Shore & M. S. Ry. Co., 43 Ohio, 596, 3 N. E. 916.]

8. The legislature, and not the judiciary, is to determine what is a public use for purposes of taxation.

9. The taxation authorized in this case is not in violation of the provision of the constitution against depriving a person of property without due process of law. This clause has no reference to the objects and purposes of a statute, but to the mode in which rights are ascertained.

[Cited in Wells v. Oregon Ry. & N. Co., 15 Fed. 571.]

10. The provision in the constitution that the state shall not be a party to, or interested in any work of internal improvement is, on principle, and by repeated and numerous and uniform decisions, and by the legislative action of Michi-

gan, confined to the state as such, and in its corporate character. It in no way touches the right of the legislature to authorize municipalities to make or aid such work. Neither is it against the provision requiring a uniform rule of taxation. That is uniform taxation which is uniform throughout the taxing district. To fix the extent of such district is a legislative, and not a judicial, function.

11. A railroad is not private property—it is devoted to public uses. When the land is taken by authority of the commonwealth under right of eminent domain it becomes a public highway. No corporation has property in it, but it may have franchises annexed to and exercisable within it.

In 1869, the legislature of Michigan passed an act to enable any township, city or village to pledge its aid by loan or donation, to any railroad company, as specified in said act. Laws 1869, p. 89. Under this act, certain bonds were issued in aid of the Kalamazoo & South Haven Railroad Company, by the township of Pine Grove, in the county of Van Buren, Western district of Michigan. An action was brought to recover the amount due on certain of these bonds and on coupons for interest by [Edward B. Talcott,] a citizen of another state, in the United States circuit court for that district. And similar suits were brought against the towns of Port Huron and Battle Creek. The three cases were heard before Judges Emmons, Withey, and Longyear, on demurrer.

D. D. Smith, Walker & Kent, Ashley Pond, and T. Romeyn, for plaintiffs.

Littlejohn, Severens, Douglass, Beakes. Emerson, Canfield & Lothrop, for defendants.

Before EMMONS, Circuit Judge, and WITHEY and LONGYEAR, District Judges.

EMMONS, Circuit Judge. This is an action upon bonds issued by the township of Pine Grove, under an act authorizing municipalities to aid corporations in the construction of railroads. They were issued in full compliance with the statute. The railroad is in successful operation, and the people of Pine Grove have reaped the benefits for which they pledged their credit. Full consideration for the bonds has been paid by Talcott in reliance upon what he deemed well settled rules of law affirming their validity.

Natural justice requires that these bonds should be paid. If, however, there is a rule of law obligatory upon us which forbids judgment in favor of the plaintiff we must follow it, however repugnant it may be to our feelings, or however novel and technical may be the rule.

The case presents but two questions: (1) Is the law which authorized the issuing of the bonds prohibited by the constitution of Michigan? (2) If, in our judgment, it is not, are we bound, contrary to our convictions, to follow the decision of the supreme court of Michigan holding that it is? Both these questions, we think, are determined by the

decisions of the supreme court of the United States, which are mandatory upon us.

We shall first consider the question last stated. As a general rule, to which there are rare exceptions, the United States courts will, in the construction of state statutes or constitutions, follow the decisions of the highest court of the state. Leffingwell v. Warren, 2 Black [67 U. S.] 599, and numerous other judgments so decide. All concede this, and cases need not be further cited.

But the decision of the supreme court of Michigan in People v. Salem, 20 Mich. 452, which the counsel for the defendant claim must control ours, is not based upon any principle peculiar to the state constitution. It is placed on reasons equally affecting those of every state in the Union, and especially that of the national government.

It is said that taxation in support of a railroad owned and controlled by citizens is not within the taxing power of our American governments. This is a broad generality, asserting a principle of jurisprudence and political power having no reference to any particular clauses of the local organic law. It would invalidate the great number of land donations to railroad companies by congress, the laws giving bounties to fishermen, subsidies to steamboat lines, the public money to academies and other schools controlled by individuals, and all that extensive and familiar legislation, the "purpose" of which is, by donations and subsidies, to aid the business of individuals, in which the public have an especial interest, but in the "management of which they have no voice." A thousand state laws, hitherto unquestioned, reaching back to the earliest periods of American history, would fall under this rule.

When such general principles are asserted by the state courts, as a ground for invalidating contracts, they are adopted or disregarded by the federal courts, as they deem them sound or otherwise, and as justice in the class of cases before them demands. A few of the leading cases so ruling will be referred to.

In City of Chicago v. Robbins, 2 Black [67 U. S.] 418, the supreme court refused to follow the decision of the highest court of Illinois in reference to a question of negligence by a municipal corporation, because it depended upon the common law, applicable alike in Illinois and elsewhere.

In Williamson v. Berry, 8 How. [49 U. S.] 495, it disregarded the judgments of the courts of New York upon the construction of a private statute affecting the title to lands, on the ground that such statute was not a part of the general law of the state. See, also, Lane v. Vick, 3 How. [44 U. S.] 464.

In Swift v. Tyson, 16 Pet. [41 U. S.] 1, the decisions of New York, in reference to negotiable paper, were not followed because it was a question of general commercial law not peculiar to New York. See, also, Carpenter v. Insurance Co., 16 Pet. [41 U. S.] 495; Miller v. Austin, 13 How. [54 U. S.] 218; Foxcroft v. Mallett, 4 How. [45 U. S.] 353.

The supreme court of Michigan, some years since, by repeated judgments, decided that certain forms of notices were insufficient to fix the liability of indorsers. Platt v. Drake, 1 Doug. [Mich.] 296; Newberry v. Trowbridge, 4 Mich. 391. Under these decisions hundreds of thousands of dollars were lost. The federal courts refused to follow them. Subsequently the supreme court of the state overruled its former judgments, and adopted the rule of the national courts. Burkam v. Trowbridge, 9 Mich. 209.

But this distinction need not be pursued, as the general rule is not doubted, the question now being whether this judgment of the Michigan court comes within it. We have said that it does, but it is equally unnecessary to discuss this at length, because the undoubted doctrines of the national court make it wholly immaterial whether the judgment in People v. Salem, or the reasons of the later case of People ex rel. Bay City v. State Treasurer, are before us. This later judgment has been rendered since the institution of this action. In addition to the reasons relied upon in the former decision, it is now said that the law is prohibited by three clauses in the state constitution, viz.: that which prohibits the taking of property without due process of law; that which requires uniformity of taxation, and that which forbids the state to engage in works of internal improvement.

To the almost universal rule before announced, that the courts of the Union will implicitly adopt those of the states in reference to local constitutions and laws, there is a single exception in practice, so rarely occurring that, although firmly established, it is frequently overlooked. A brief review will demonstrate that, as to past transactions and contracts, when they will be destroyed by a new local rule, we have no right to adopt the state judgment, if, after careful study, we have no doubt it is wrong.

In the discussion before us the learned counsel for the defendant declined all argument of the rectitude of the state decision, and reposed solely upon the doctrine that its reasons were not subject to review here, and although it destroyed investments, and, in violation of the national constitution, impaired the obligation of contracts, it was in a plenary and judicial sense obligatory upon this court. When such consequences occur, the rule relied on is never applied. They constitute the exception within which, we think, the case of Talcott comes. It is one the justice of which will commend itself to every citizen, and beget nothing but satisfaction so long as it is rigidly confined to the pressing and necessary inducements to its establishment.

The cases are numerous, and differ chiefly

in the facts on which the courts relied in determining that the contracts before them were based upon rules of law deemed settled when they were made. In some instances there had been no state judicial decisions establishing the principles on which contracts were founded, but the supreme court refused to follow subsequent local rulings, denying their validity, solely because they were unwarranted and at war with those general principles upon which all citizens must necessarily rely.

Rowan v. Runnels (1847) 5 How. [46 U. S.] 134. This case, decided nearly a quarter of a century ago, is very instructive as to the degree of local acquiescence and state interpretation which is deemed necessary for the protection of a contract made in reliance upon it. The constitution of Mississippi, adopted in 1833, provided that the importation of slaves should be prohibited. In 1837, the legislature, in compliance with the constitution, passed an act prohibiting such importation. During the four years prior to the passage of the law, the traffic proceeded without question, but no judicial determination was pronounced either in favor of or against its validity until after the contracts before the court had been made. The suit was upon two promissory notes, the sole consideration for which was slaves imported into Mississippi, and sold by plaintiff to defendant before the passage of the statute. In Groves v. Slaughter, 15 Pet. [40 U. S.] 449, the supreme court had affirmed the validity of such contracts, although there had been at that time some judicial determination the other way, by divided courts in Mississippi. Before this suit was brought, however, the courts of Mississippi had directly and repeatedly ruled that the constitution itself prohibited the importation of slaves without a statute to enforce it, and that such contracts were void. The question was, whether, under these circumstances, the decisions of the state court were obligatory upon those of the nation. Not only had there been no decisions in Mississippi prior to the making of the contracts on which they had been based, but there were none of courts involving the same principle in other states. It was the construction of a purely local clause of the state constitution. There had been but one act of the legislature which impliedly sanctioned the construction given by the federal court. There had been but four years of practical construction. But, as many contracts had been made and much property transferred in reliance upon it, the court, after a most full argument, refused to follow the state adjudications which destroyed them. Chief Justice Taney, in delivering the opinion of the court, says: "Undoubtedly this court will always feel itself bound to respect the decisions of the state courts, and from the time they are made will regard them as conclusive in all cases upon the construction of their own constitutions and laws. But we ought not to give them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other states, which, in the judgment of this court, were lawfully made."

This decision did not depend upon the fact that the same point had been before decided by the United States court. Over and over again it has receded from its construction of local laws and constitutions, when subsequently the state tribunals have ruled otherwise. Green v. Lessee of Neal, 6 Pet. [31 U. S.] 291; Suydam v. Williamson, 20 How. [61 U. S.] 427; Leffingwell v. Warren, 2 Black [67 U. S.] 599.

Nor did it proceed on the ground that the contract was in reliance upon Groves v. Slaughter, for it had been made long before that decision was rendered.

Rowan v. Runnels has been repeatedly quoted in subsequent cases. It is among the most deliberate and frequently approved judgments of the court. In its circumstances it calls for a far more liberal application of the exception to the general rule which requires us to follow the decisions of the state courts than does the case before us. We could not decide this point adversely to the plaintiff without assuming to disregard this judgment of the supreme court.

Pease v. Peck, 18 How. [59 U. S.] 595, arose upon the construction of a Michigan statute of limitations. By an error of the printer, the statute as published had an exception as to persons "beyond seas," and this had been supposed to be correct for many years, but it does not appear that any judicial decisions had been based upon this reading. The Michigan supreme court decided that the manuscript copy which did not contain the words "beyond seas" must govern. The supreme court of the United States refused to follow this construction on the ground that the other view had been so long supposed to be valid that it had become the basis of contracts.

In State Bank v. Knoop, 16 How. [57 U. S.] 369, the Ohio supreme court decided that a statute regulating the taxation of the plaintiff bank was not a contract, and that if such had been the intention of the law, it was in violation of the constitution of the state. This judgment, on writ of error, was reversed by the national court. It decided that the law did create a contract, and that it was not prohibited by the local constitution. Just what is now asked in the case before us was there done. That the point arose upon writ of error, and that the contract was created more immediately by a statute, are immaterial conditions, will fully appear by subsequent citations. The opinion of Taney, Chief Justice, was delivered in the case of Trust Co. v. Debolt, 16 How. [57 U. S.] 432, at the same time before the court. It is affirmed, after the most searching argument, in Dodge v. Woolsey,

18 How. [59 U. S.] 332; State Bank v. Knoop, 16 How. [57 U. S.] 380; Jefferson Bank v. Skelly, 1 Black [66 U. S.] 436.

Gelpcke v. Dubuque, 1 Wall. [68 U. S.] 175, was an action on bonds issued by the city in aid of a railroad company. There had been prior decisions of the supreme court of Iowa holding similar bonds valid. Subsequently to the making of those in suit, that court reversed its former rulings and adopting the same conclusions as those arrived at by the supreme court of Michigan in the Salem Case, declared the law unconstitutional. Justice Swayne says: "The same principle applies when there is a change of judicial decision as to the constitutional power of the legislature to enact the law. To the rule thus enlarged we adhere. It is the law of this court. To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal." And see, following this principle: Von Hoffman v. Quincy, 4 Wall. [71 U. S.] 535; Meyer v. City of Muscatine, 1 Wall. [68 U. S.] 384; Thomson v. Lee County, 3 Wall. [70 U. S.] 327; Rogers v. Burlington, 3 Wall. [70 U. S.] 654; Mitchell v. Burlington, 4 Wall. [71 U. S.] 270. In Havemeyer v. Iowa City, 3 Wall. [70 U. S.] 294, the doctrines in Gelpcke v. Dubuque, are applied in circumstances going very far beyond the necessities of the case at bar. The question was, whether the law under which the bonds were issued had been so published as to make it effective before the action under it was taken. The state court had expressly decided, subsequent to the creation of the bonds, that it had not. A single prior decision had been made which implied the contrary. But, as the attorney general of the state had published the law, and action had taken place under it, the supreme court say, at page 303, that the former state judgment was a recognition of the public character of the act, and the action of the executive had been in harmony with it. That prior to the changed opinion of the court no intimation had been given that they were otherwise than local, and that it "being posterior to the time the bonds were issued it can have no effect upon them. We can look only to the time when the securities were issued." The rule, it is said, was established upon the most careful consideration, and would be adhered to.

Buttz v. Muscatine, 8 Wall. [75 U. S.] 575. This case is in principle like that of Von Hoffman v. Quincy, in 4 Wall. [71 U. S.] 535, where the power of taxation to pay the bonds was attempted to be taken away by a legislative repeal of the law which authorized it. In this the same effect was produced by judicial decisions. When the bonds were issued, the state law, in the opinion of the federal court, authorized taxation for their payment, although no state decisions so holding had been made. By adjudications of the Iowa courts subsequent to their issue, it

was determined that such power did not exist, and the supervisors therefore refused to assess the tax. Mandamus was applied for in the circuit court of the United States to compel it. Judge Swayne, in delivering the judgment of the court, after referring with approbation to the Von Hoffman Case, and to the cases which hold that the remedy is part of the contract, says that here, although it is taken away, not by repeal, but by judicial decisions, the effect is the same; that in the construction and protection of contracts the court must act independently of the state courts, and the fact that a statute was concerned could not vary the result. The rights of the relator, he said, "could no more be taken away by subsequent judicial decisions than by subsequent legislation. It is as much our duty to protect the contract from the one as the other." If the construction ultimately given by the state court had preceded the issuing of the bonds that would have been followed.

The two preceding and the following judgments are demonstrative of the adoption by the national courts of a principle broad and comprehensive; wholly unfettered by any narrow limitations which will arrest its application this side of the most complete protection of what was done in good faith in reliance upon existing law. No matter what the form of the action, or howsoever the court is called upon to coerce directly the action of local political officials, it will proceed as freely and minutely as though its action was invoked to correct the refusals of national officers. Judgment was obtained in the national circuit court in disregard of local judgments. The supervisors, in obedience to the state judgments, refused to levy the tax to pay it, and there was no county property subject to levy to satisfy it. The court issued mandamus to compel their action, and the state courts enjoined it. The officers, obeying the state instead of the national court's process, refused still to make the assessment. In these circumstances, Amy v. Supervisors, in 11 Wall. [78 U. S.] 136, held the officers individually liable for a breach of official duty, in refusing to obey the writs of the national court, and judgment was given against them for the amount of the tax it was their duty to have assessed. The whole proceeding, from the rendition of the original judgment to that against the contumacious supervisors, was in direct conflict with repeated rulings in the state court upon every point required to sustain the judgment. See Chicago v. Sheldon, 9 Wall. [76 U. S.] 50; Riggs v. Johnson County, 6 Wall. [73 U. S.] 166; Kenosha v. Lamson, 9 Wall. [76 U. S.] 477.

Although elsewhere fully considered, and not germain to the present argument, it is satisfactory to add that the differing local judgments are all overruled by the local courts which made them. It is then not a right only, but an imperative duty, about the

performance of which this court has no possible discretion to administer the law as, after the most full examination in our power, we believe it to be. This should be made in view of all that effect which we must ever give to a state decision that we know was rendered only after the most thorough argument and full and careful consideration; one which has been made in ignorance of no single condition of the question answered, but in a deliberate and conscientious disregard of the most learned, numerous and persuasive body of opinions ever before given upon any one subject in the whole history of our constitutional law. It did not involve a misconception of these opinions, but it was intentionally revolutionary in doctrine. It asserts independence of precedents, and expressly condemns the old conservative idea of stare decisis if the "first judgment in the series" is believed to be wrong. It of all other judgments presents just that exercise of judicial authority which has called forth the condemnatory and dissenting opinions cited by us, and which demand and sustain the ruling which we feel compelled to make.

The other question is just as conclusively settled by the supreme court, whose judgments we must follow, as the one we have thus far considered. That the law is constitutional, and the contracts valid and obligatory upon the municipalities making them, and that it is our duty to enforce them, has been affirmed in nearly every judgment thus far cited. We have nothing to decide upon principle. The law is settled by adjudication, confirming wide and long-continued usage. Certainly, in the courts of the United States, the question is no longer open.

In Gelpcke v. Dubuque, 1 Wall. [68 U. S.] 205, Judge Swayne, delivering the opinion of the court referring to the decisions holding such statutes to be constitutional, says: "The earlier decisions, we think, are sustained by reason and authority. They are in harmony with the adjudications of sixteen states of this Union. Many of the cases in the other states are marked by the profoundest legal ability. The late case in Iowa, and two other cases in another state, also overruling earlier adjudications, stand out, so far as we are advised, in unenviable solitude and notoriety." Where there is no defect of constitutional power such legislation, in cases like this, is valid. This question, with reference to a statute containing similar provisions, came under the consideration of the supreme court of Iowa in McMillen v. Boyles [6 Iowa, 304], and again in McMillen v. County Judge and Treasurer of Lee County [Id. 391]. The validity of the act was sustained. Without these rulings we should entertain no doubt upon the subject. In Rogers v. Burlington, 3 Wall. [70 U. S.] 663, Judge Clifford, in delivering the opinion of the court, says: "Railways, also, as a matter of usage founded on experience, are so far considered by the court as in the nature of im-

proved highways, and as indispensable to the public interest and the successful pursuit even of local business, that a state legislature may authorize the towns and counties of a state through which a railway passes to borrow money, issue their bonds, subscribe for the stock of the company, or purchase the same with a view of aiding those engaged in constructing or completing such a public improvement." "Decisions to that effect have very much increased in number within the last few years, and are constantly increasing, both in the state and federal courts, until it may be said that the rule here laid down pervades the jurisprudence of the United States." See, also, Meyer v. Muscatine, 1 Wall. [68 U. S.] 384; Thomson v. Lee Co., 3 Wall. [70 U. S.] 327; Havemeyer v. Iowa Co., 3 Wall. [70 U. S.] 294; Kenosha v. Lamson, 9 Wall. [76 U. S.] 477; Mercer Co. v. Hacket, 1 Wall [68 U. S.] 83; Amy v. Supervisors, 11 Wall. [78 U. S.] 136. These decisions were nearly all made under constitutions containing every clause which is relied on in that of Michigan to invalidate the law of Michigan. Nor is there anything in the history of the state which should give these clauses a peculiar meaning. These decisions are then, virtually, a construction of the constitution of Michigan, which is mandatory upon us.

Much was eloquently said by counsel, in the discussion of this case, about the evils which would follow a decision in opposition to that of the state tribunals. We do not anticipate any such results. The able and experienced lawyers, who constitute the supreme court of Michigan, acted with full knowledge of the doctrine so firmly established by the national court. They knew with certainty that, in the limited class of cases in which bonds issued before their decision could come before this court, we must hold them valid. Nor can we believe that they will regret this. However imperative seemed to them the duty of holding the acts unconstitutional, and for the future preventing all action under them, they will be gratified that bonds for which full consideration has been paid can be made good to the purchaser. Nor do we believe that the people of the municipalities whom our decision renders liable will regret it. Rather, we hope, that they will rejoice that a way has been opened whereby debts contracted with their assent, and for which they have received full consideration, may be paid and they relieved from the appearance of repudiation.

And here ordinarily this opinion would terminate; but the history of the discussion and the circumstances in which the question arises not merely justify, but demand some consideration of the reasons on which our dissent rests, irrespective of the decisions of that court, which we are compelled to follow. It is evident that, in treating subjects involving the nature of our govern-

ments, the general legislative power of the states and the meaning of clauses, some of which are as old as Magna Charta, where so much depends upon the history of their administration, a glance only can be given to each. Much narrower limits suffice for the denial of old and familiar truths than for their demonstration. A portion only of our objections to these judgments can be considered at all. The high character of the judges who pronounced them, the far more than ordinary public confidence in their conscientiousness and great ability, relieve us from all fear that a plain statement of the reasons of our dissent will be construed into disrespect. In discussion, opinions are likely to be stated with confidence, but this does not imply that equal intelligence and desire to be right, might not decide differently.

Having concluded, after much doubt, to add in part our reasons upon principle, we regret greatly that beyond the consideration of the points already treated so little discussion was had at the bar. The defense assumed that it was our duty to follow the state ruling, irrespective of its reasons; and the plaintiff's counsel deemed it too evidently erroneous to demand more than a reference to the numerous decisions it opposes. Our own judgment, rendered in circumstances not permitting that examination which we should have been pleased to make, must necessarily be somewhat imperfect.

The first and most obvious objection to these judgments is that they disregard so great a number of antecedent decisions of the courts of other states, and the United States, directly upon the point, as to render them an extraordinary and unwarrantable departure from well settled judicial action. The rule which is denied had, in fact, become a part of "American jurisprudence."

In order to see this clearly, we cite a series of cases decided in twenty-five states, and all sustaining the doctrines overlooked or overruled by the supreme court of Michigan:

Alabama: Stein v. Mayor of Mobile (1854) 24 Ala. 591; Mayor, etc., of Wetumpka v. Winter (1857) 29 Ala. 651; Gibbons v. Mobile, etc., R. Co. (Plank Road Case; 1860) 36 Ala. 410.

California: Pattison v. Board of Supervisors of Yuba Co. (1859) 13 Cal. 175; Hobart v. Supervisors of Butte Co. (1860) 17 Cal. 23; Robinson v. Bidwell (1863) 22 Cal. 379; French v. Teschemaker (1864) 24 Cal. 518; People v. Coon, 25 Cal. 635; People v. Supervisors of San Francisco (1865) 27 Cal. 655; Stockton & V. R. Co. v. City of Stockton, 51 Cal. 329.

Connecticut: City of Bridgeport v. Housatonic R. Co. (1843) 15 Conn. 475; Society for Savings v. City of New London (1860) 29 Conn. 174.

Delaware: Rice v. Foster (1847) 4 Har. (Del.) 479.

Florida: Cotten v. County Commissioners of Leon Co. (1856) 6 Fla. 610.

Georgia: Winn v. City of Macon (1857) 21 Ga. 275; Powers v. Inferior Court of Dougherty Co. (1857) 23 Ga. 65.

Illinois: Ryder v. Alton & S. R. Co. (1851) 13 Ill. 516; Prettyman v. Supervisors of Tazewell Co. (1858) 19 Ill. 406; Robertson v. City of Rockford (1859) 21 Ill. 451; Johnson v. Stark Co. (1860) 24 Ill. 75; Perkins v. Lewis (1860) Id. 208; Butler v. Dunham (1861) 27 Ill. 474; Clarke v. Board of Supervisors, etc. (1862) Id. 305; Piatt v. People (1862) 29 Ill. 54; King v. Wilson [Case No. 7,810]; Chicago, etc., R. Co. v. Smith (decision just rendered in supreme court for Northern division of Illinois; 1872) not yet reported [62 Ill. 268].

Indiana: City of Aurora v. West (1857) 9 Ind. 74; Evansville, etc., R. Co. v. City of Evansville (1860) 15 Ind. 395; Commissioners, etc., v. Bright (1862) 18 Ind. 93; City of Aurora v. West (1864) 22 Ind. 88; Lafayette, M. & B. R. Co. v. Geiger, 34 Ind. 185.

Iowa: Dubuque Co. v. Dubuque & P. R. Co. (1843) 4 G. Greene, 1; State v. Bissell (1854) Id. 328; Clapp v. Cedar Co. (1857) 5 Iowa, 15; Ring v. Johnson Co. (1858) 6 Iowa, 265; McMillen v. Boyles (1858) Id. 304; McMillen v. County Judge, etc., of Lee Co., Id. 391; Whittaker v. Johnson Co. (1859) 10 Iowa, 161; Stewart v. Board of Sup'rs of Polk Co. (late case) reported in pamphlet [30 Iowa, 9].

Kansas: Commissioners of Leavenworth Co. v. Miller (1871) 7 Kan. 479.

Kentucky: Talbot v. Dent (1849) 9 B. Mon. 526; Justices of Clarke County Court v. Paris, W. & K. R. Turnpike Co. (1850) 11 B. Mon. 143; Slack v. Maysville & L. R. Co. (1852) 13 B. Mon. 1; Maddox v. Graham (1859) 2 Metc. 56.

Louisiana: New Orleans, O. & G. W. R. Co. v. McDonogh (1853) 8 La. Ann. 341; Parker v. Scogin (1856) 11 La. Ann. 629; Vicksburg, S. & T. R. Co. v. Parish of Ouachita, Id. 649; City of New Orleans v. Graihle (1854) 9 La. Ann. 561.

Maine: Augusta Bank v. City of Augusta (1860) 49 Me. 507.

Mississippi: Strickland v. Mississippi, etc., R. Co., cited as of 21 (or 27) Miss. 209, and as in 1849.

Missouri: City of St. Louis v. Alexander (1856) 23 Mo. 483; St. Joseph & D. C. R. Co. v. Buchanan County Court (1867) 39 Mo. 485.

New York: Grant v. Courter (1857) 24 Barb. 232; Benson v. Mayor of Albany, Id. 248; Clarke v. City of Rochester, Id. 446; Bank of Rome v. Village of Rome (1858) 18 N. Y. 38; Gould v. Town of Venice (1859) 29 Barb. 442; Starin v. Town of Genoa (1861) 23 N. Y. 439; Clarke v. City of Rochester (1864) 28 N. Y. 605; People v. Mitchell (1865) 45 Barb. 208; People v. Mitchell (1866) 35 N. Y. 551.

North Carolina: Taylor v. Commissioners of Newberne (1855) 2 Jones, Eq. 141 (a navigation case); Caldwell v. Justices of Burke Co. (1858) 4 Jones, Eq. 323.

Ohio: Cincinnati, W. & Z. R. Co. v. Commissioners of Clinton Co. (1852) 1 Ohio St. 77; Steubenville & I. R. Co. v. Trustees of North Tp., Id. 105; Cass v. Dillon (1853) 2 Ohio St. 607; Thompson v. Kelly, Id. 647; State v. Van Horne (1857) 7 Ohio St. 327; State v. Trustees of Union Tp. (1858) 8 Ohio St. 394; State v. Commissioners of Hancock Co. (1861) 12 Ohio St. 596; Commissioners of Knox Co. v. Nichols (1863) 14 Ohio St. 260; State v. Mayor, etc., of Perrysburg, Id. 472; State v. Trustees of Goshen Tp., Id. 569; Griffith v. Commissioners of Crawford Co., 20 Ohio Append. 1; Bloomington R. Co. v. Gaiger (April, 1871) 4 Law T. St. R. 98.

Pennsylvania: Harvey v. Lloyd (1846) 3 Pa. St. 331; Com. v. McWilliams (1849) 11 Pa. St. 62 (turnpike case); Sharpless v. Mayor of Philadelphia (1853) 21 Pa. St. 147; Moers v. City of Reading, Id. 188; Com. v. Commissioners of Allegheny Co. (1858) 32 Pa. St. 218; Com. v. Councils of Pittsburgh (1861) 41 Pa. St. 278; Com. v. Perkins (1862) 43 Pa. St. 400.

South Carolina: State v. Mayor, etc., of City of Charleston (1857) 10 Rich. Law, 491.

Tennessee: Nichol v. Mayor, etc., of Nashville (1848) 9 Humph. 252; Louisville & N. R. Co. v. Davidson County Court (1854) 1 Sneed, 637.

Texas: City of San Antonio v. Jones, 28 Tex. 19.

Vermont: Cadis v. Town of Swanton (late case; not reported).

Virginia: Goodin v. Crump (1837) 8 Leigh, 120; Harrison Justices v. Holland (1846) 3 Grat. 247.

Wisconsin: Clark v. City of Janesville (1859) 10 Wis. 136; Bushnell v. Beloit (1860) Id. 195; Mills v. Gleason (1860) 11 Wis. 470.

These cases have been frequently collated and the results announced by elementary writers. Among others, Judge Cooley, in his work on Constitutional Law (pages 189–259) quite fully does so. After an extensive discussion of many of the cases cited, and of that large class of authorities embodying the same principle in reference to the payment of bounties to soldiers, granting aid to private schools and works beyond the limits of the municipality, and asserting a distinction between the cases where the donation is permitted and where it is coerced by the law, he says: "If these cases are sound, the limitations which rest upon the power of the legislature to compel municipal corporations to assume and discharge obligations can only be such as spring from the general principles governing taxation, namely: That the purpose shall be such as to constitute a proper charge upon the state or portion of the state taxed to accomplish it. But upon this question the legislature is vested with discretionary and compulsory power, and its decisions are not subject to review by the courts. They must be final, unless clear cases where there is no ground to adjudge the purpose to be a proper one for taxation." The whole chapter is a full and unqualified concession that the purpose of laws like the one under consideration is public, within the meaning of the taxing power, when the road runs through the town granting the aid. The cases where no part of it does so, and where the municipality is compelled, not permitted only, to aid work beyond its limits, are thus criticised: "But those cases which hold it competent for the legislature to give its consent to a municipal corporation engaging in works of internal improvement outside its territorial limits, and become stockholders in a private corporation, have gone to the limits of constitutional power in this direction, and to hold that it may go further and compel them, is introducing a new principle."

On page 536, speaking of taking private property for public use, he justifies the delegation of the right to private corporations upon the ground that experience has shown that "these highways can be better managed for the public benefit in the hands of individuals than in the hands of the state or local municipal officers." He adds that after the legislature has decided that the general benefit is in this mode better promoted, "it would clearly be pressing a constitutional maxim to an absurd extreme to say the public necessity should be provided for only in the way least consistent with the public interest, and the fact that the members have a pecuniary interest such as will give the company the character of private, will not prevent the state from using it to accomplish the public object." The leading cases are cited, several of which in express terms put this power and the taxing power upon the same ground. Judge Cooley quotes with approbation from People v. Smith, 21 N. Y. 597, what is said by the learned and politically experienced Judge Denio. He says: "The necessity for appropriating property to public use is not a judicial question. The power resides in the legislature. It may be exercised directly by the statute or delegated to private corporations established to carry on enterprises in which the public is interested. This power stands on the same ground as the taxing power. Both are emanations from the lawmaking power. They are attributes of political sovereignty, for the exercise of which the legislature is under no necessity to address itself to the courts. In imposing a tax, as in appropriating property to public use, the statute itself is 'due process of law.'" Judge Cooley, as an author, shows that it is a well settled axiom of American constitutional law that what is a public use for taxation and appropriation is not a judicial but legislative question. He pro-

nounces the objection "absurd," that when the public object is declared by the legislature it cannot employ for its accomplishment a corporation, because its members have private pecuniary interests in its shares. This is not the theory of an author or speculative opinion. He but fairly and intelligently condenses the unquestioned and numerous judgments he cites. We know of no decisions to the contrary by courts of last resort, save in the single state of Wisconsin and the few short-lived ones in Iowa, now ·overruled by the court which pronounced them. Those in Wisconsin are accompanied by qualifications so inconsistent as to call for their express rejection by the Michigan courts. It may be said to stand alone, without a concurring, un-overruled judgment in the nation.

Nor is there anything peculiar in the jurisprudence of Michigan. Its decisions upon ·the precise principle involved are numerous and pointed. But we shall the better understand them if, before their consideration, we clearly ascertain what it is which has been aided in the present instance. It will appear that these corporations are, in the most strict · and full sense, governmental agencies, ·and political trustees, having no resemblance to private mills and hotels, and that the· previous local judgments go far beyond the necessities of the plaintiff's case.

Judge Cooley, speaking for the majority of the court in People v. Salem [20 Mich. 452] concedes expressly that such a railroad would be within the taxing power, provided it ·was controlled by the public. But it is asserted that when the shares are owned by individuals, as the public has no voice in its control, the corporation is strictly private, and the aid is unconstitutional. In the second opinion he wisely disclaims all distinction between donations and subscriptions to stock. If, therefore, nine-tenths of the shares ·are owned by the towns, the aid would be illegal, but if all are so, it is lawful.

Protesting against the necessity for any such argument, believing that under all our ·American constitutions, the judiciary has no concern with this clearly legislative question ·of what shall be the instrument of accomplishing a public purpose, we respectfully suggest that the criticism of the learned court, had in the statute before them, no foundation in fact. The corporations referred to in the statute were not in any sense, here involved, "strictly private." Authors who class these corporations as such, because individuals own their shares, warn the reader against the use of this classification made in People v. Salem. They say· most fully that when they are created for public purposes, perform public duties and exercise delegated sovereign rights for that purpose, they are public in their nature. As said in Swan v. Williams [2 Mich. 427], a fourth of ·a century since, in Michigan, they are quasi

public, and stand in a distinct class by themselves.

For all time the setting up of a highway or ferry for conveying persons and property has been deemed, in the common law, a franchise, a matter of governmental concern, .a part of the subjects in the immediate possession of the political power, and, to exercise which, demanded a release of this right by the sovereign, by special grant or charter. It is not, in its nature or actual history, like those private avocations of milling, hotel keeping and traffic, which all may pursue at pleasure unless, in the exercise of police power, a restraining statute interferes and requires a license. 3 Kent, Comm. 458, says there are certain franchises which are understood to be royal privileges in the hands of the subject. The right to set up a ferry or a road, and the taking of tolls,. is one of them, and in this the public has an interest. In 2 Bl. Comm. 37, it is said that "a franchise is a branch of royal prerogative in the hands of the subject," such as the right of taking toll for a bridge, way or· wharf (see.3 Bl. Comm. 219). In 18 Iowa, 327 (Prosser v. Wapello Co.), this subject is fully discussed by Dillon, J., and the leading. English and American cases cited, showing that a road for tolls, or a ferry is a franchise, and is held by the citizen when granted as a public office. At pages 334, 335, it is said "that a party cannot set up a ferry even on his own land, without the consent of the state." A long list of state and federal judgments, over forty in number, are referred to. They show, beyond doubt, that these rights are held by the grantee as the agent and trustee of the political power; that they are in no sense private, but continue after, as well as before, the grant, to be but a portion of the public government.

This well-known rule, in reference to all the ways of transit, sprang from the essentially public character of the duties connected with their management. The absolute commercial and business necessity for permanence. when established, forbade, from the earliest periods, the manifest impolicy of leaving this great interest to the laws of· supply and demand. which, thus far, have sufficiently supplied the community with inns. So deeply is this founded in the nature· of the thing that, in a large degree, such is the law of every country to which our examinations have extended. As civilization advanced, the transmission of intelligence was ranked in the same category. The public mails of all countries, and the penalty on the citizen for performing this duty, show the difference between these great and pervading agencies and a mill. Here, as in England, the telegraph may follow. There is something in this whole department soliciting to its control the hand of political power, which thus far has never released it or suffered it to fall into the ranks of those interests to which it has, we think, most un-

warrantably been likened. And it is not true, we submit, that it is in degree only, that these franchises differ in their relations to the public from mills and inns, as is said in People v. Salem. The one is private property; the other is a political function, which, when resting in the hands of government where originally it resided, or delegated still for the same public use, to either persons or corporations, ever has been, and of right may be, aided by taxation. Whether in the immediate possession of the sovereignty, or placed in legal organizations controlled by public law for the purpose, it is equally controlled by, and the political power has a voice in, its most minute management.

It is for the performance and regulation of this old and familiar governmental duty, in a mode deemed by the legislature most efficient and economical, that in modern times railway and other corporations have been created. And in the most plenary and critical sense, under the general railroad law of Michigan, they are parts of the political organism. The entire duty they perform is a public one, and a charter from the law-making power is necessary to its exercise. A prescribed organization, an amount of capital to secure the public against failure, and an offer of shares by public officers under guarded laws to all citizens alike, eminently distinguished these strictly public corporations from private adventures. The weight of the iron, the speed of trains, the amount of equipment, the duty of officials, the mode and time of their election, the apportionment of their duties, and the tenure of their offices, are all fixed by public law. The time for the commencement and completion of the work, the filing of maps for public information, the power to exercise the highest and most sovereign right in the government—that of seizing, against the will and interest of the owners, the farm, the church, and the homestead—is exercised solely for the public use. In each instance juries must find not only that the land and materials taken are necessary for the contemplated way, but that the way itself is necessary for the public. See Mansfield C. & L. M. R. Co. v. Clark, 23 Mich. 519. They are authorized to cross highways, bridge navigable streams, and enter the streets of our great cities. The road must be built from and to the precise places, and pursue in its whole length the exact route, thus, by successive juries, found to be governmental necessity. These are but portions of the still more minute regulations contained in the statutes for the creation of these public roads. The control over the mode of construction, the place of location, the continuance of the way, and the efficiency of operation is not only equal to, but greatly exceeds, that provided by law in reference to the common highways of the state.

The road, once constructed is, instanter, and by mere force of the grant and law, embodied in the governmental agencies of the state and dedicated to public use. All and singular its cars, engines, rights of ways and property of every description, real, personal and mixed, are but a trust fund for the political power, like the functions of a public office. The judicial personage, the corporation created by the sovereign power expressly for this sole purpose and no other, is in the most strict, technical and unqualified sense, but its trustee. This is the primary and sole legal, political motive for its creation. The incidental interest and profits of individuals are accidents, both in theory and practice. Every farthing of its tolls is first to be devoted to paying the public tax, and to the continuance of the road, its ample equipment and regular operation as the interests of the community, not those of shareholders, demand. No matter that a dividend is never paid, that the private investment is sunk and worthless, that the interest upon its bonds is not met, and that all its creditors go unpaid, every dollar of its earnings must nevertheless be applied to keep up its maximum efficiency, as required by the political power in the law which created it. The neglect of the smallest of these duties in which the community is interested will be enforced by the public writ of mandamus, and in Michigan by various statutory proceedings at the suit of the attorney general. This law officer of the state is especially charged by statute with the duty of enforcing them. That a railroad cannot be abandoned after it has become one of the thoroughfares of the country, and that the company will, by proceedings in behalf of the state, be forced to continue its road and perform all its duties to the public, is beyond question.

In State v. Hartford & N. H. R. Co., 29 Conn. 538, a railroad company refused to run trains over a part of its road. It was coerced to do so by mandamus. Ellsworth, J., said: "What right had it to covenant it would not run its cars to tide-water as its charter prescribes and the public accommodation requires?" See People v. Albany & V. R. Co., 24 N. Y. 261, 37 S. C. 216; 16 Eng. Law & Eq. 327; Id. 299. There is nowhere any conflict. York & N. M. Ry. Co. v. Reg., 18 Eng. Law & Eq. 199. The doctrine is applied in every form when the corporation neglects the public duties for which it was created. Among the most stringent applications of this doctrine is that of Erie & N. E. R. Co. v. Casey, 26 Pa. St. 287, in which a charter was repealed, and the government took possession of the road, and it was said to be seizing private property. At page 307, Black, J., says: "This act takes nothing but the road. Is that private property? It is a public highway, solemnly devoted to the public use. When the lands were taken, it was for such use, or they could not have been taken at all." "Railroads established upon land taken by the right of eminent domain

by authority of the commonwealth, created by her laws as thoroughfares for commerce, are her highways. No corporation has property in them, though it may have franchises annexed to and exercisable within them." At page 315, after saying that the company agreed to build the road as a public highway for the people, he adds: "In consideration thereof, the state consented to clothe the shareholders with a portion of her sovereignty, the right of eminent domain and the franchise of taking tolls." At page 324, he says: "Railroads built under authority of law are public highways. On this principle alone we decided that municipal subscriptions are valid." He proceeds to enumerate a large number of incidents which attach to them as public, and would not belong to them as "strictly private" corporations. In Plymouth R. Co. v. Colwell, 39 Pa. St. 337, 339, it was held that the land of a railroad company could not be levied upon by a creditor because "of the public interest in the corporation." Its rights, though in some respects private, could not, so far as the public motive for its creation was concerned, be either granted away by the company itself, or sold by a creditor. In 9 Watts & S. 27 (Susquehanna Canal Co. v. Bonham) the same ruling is made: "It would defeat the public object for which they were created." See 13 Serg. & R. 101. In Richardson v. Sibley, 11 Allen, 65, it was decided that a street railway company could not "alienate its property so as to prevent its performing the duties to the public it was created to perform." See Pierce v. Emery, 32 N. H. 504. Redfield on Railways (page 53) says, in speaking of railroad corporations in this country, that nothing more is meant in calling them private than that the shares are owned by individuals. He clearly distinguishes between the public functions and the wholly immaterial accident here, that citizens own its shares. These citations could be greatly multiplied. Most of those hereafter cited assert the same principle.

They who buy under mortgage or other judicial sales, when such proceedings are authorized by statute, succeed only to such property rights as remain after all these public duties are performed. They cannot abandon the road and take away the cars and rails as they could the fixtures of a mill or the furniture of a tavern. 2 Redf. Ry. 514 et seq., and notes.

The immateriality of the ownership of the shares will appear from a consideration of how little they control and how very far they are removed in technical right and practical power from all the incidents of ownership in reference to the company or its possessions. It is a most misleading and unfounded description of their relations to say they own either the corporation or its property. The deed of all the corporators will not pass, even in equity, the corporate lands or rights of any kind. Their admis-sion is not evidence; their knowledge does not charge it; they may be excluded like any other strangers from its cars and grounds; they may sue or be sued by it, and so complete and separable is the legal and equitable character of the stockholders and the corporation itself, that the most deliberate and fair agreements of the former, or by the promoters of the scheme, that the future company shall do acts when organized, cannot bind the latter, although the persons so agreeing own every share in the corporation.

The following cases, being illustrations only of large classes like them, sustain all the foregoing statements, and many other incidents showing the entire absence of all similitude between shareholders' rights to corporate property and those of private owners, and especially the want of identity between them and the corporation itself. That their admission will not bind it, see 21 Me. 507; 1 Cow. & H. notes Phil. Ev. 487, 488; Ang. & A. Corp. §§ 308, 657, 658; 28 Vt. 564; 3 Day, 494; 14 Me. 152.

When notice will affect rights, that all shareholders have it, is immaterial. Ang. & A. §§ 307, 308, and cases cited, say they "do not represent each other in any relation of agency." See, also, 9 Barr. [9 Pa. St.] 27; 10 Watts, 397; 4 Paige, 406, 413; 13 Conn. 182; 2 Law T. (N. S.) 78.

The deed of all the shareholders will not transfer the corporate property. Redf. Ry. 575; 15 Vt. 519; 19 Vt. 230.

The distinctions in equity, where the corporation receives the benefit and under bills for specific performance will itself be decreed to convey on the ground of its own agreement by subsequent adoption, do not affect this question. That the relation even of trustee does not exist in any sense here involved, see Ang. & A. § 313, where it is said that "the relation of trustee and cestui que trust, does not exist between corporators and the corporation, nor are they in the relation of partners, nor are they creditors. The corporation is the mere creature of the law." This, too, is the doctrine of the courts of equity. 3 Paige, 409; 1 Edw. Ch. 87, and other cases in New York; 1 R. I. 312; 1 Freem. Ch. (Miss.) 161; 30 Eng. Law & Eq. 130; Smith v. Poor, 40 Me. 415; 2 Law T. (N. S.) 525; Orr v. Glasgow A. & M. Ry. Co., Id. 550 (and see, per Lord Cranworth, pages 551, 552). Though all covenant and attempt to bind it, it is impossible in the law. 13 Mass. 408, and cases cited ante and post. That they may sue and be sued by it and contract with it like an entire stranger. Ang. & A. Corp. §§ 232, 233; 3 Hill. 391; 2 Doug. (Mich.) 124; 4 Hurl. & N. 87. Obligations of co-partnership, however equitable and however intended to attach to a corporation formed to carry on the same business, cannot be made to do so without the agreement of the corporation when in esse. 16 Pick.; Dance v. Girdler, 1 Bos. &

P. (N. R.) 34; 15 Ind. 219; 6 H. L. Cas. 417. Lord Wensleysdale (page 423) says: "They are distinct persons in the law." So substantial and free from all fiction is their distinct character, that even when the government itself owns a part or all of the shares, the company may be sued, though the government cannot be. 8 Watts, 316; 3 McCord, 377; Bank of the State v. Gibbs, 9 Wheat. [22 U. S.] 907; 6 Ala. 814; and the judgments in relation to the United States Bank in the federal courts. That the promoters and launchers of a company cannot bind it in any way, although all are shareholders, see 27 Conn. 170; 12 Metc. [Mass.] 311; 28 Vt. 401; 5 Jones, Law, 304; 18 Barb. 297; 21 Pa. St. 221; 1 Head, 30. But more particularly on the precise point involved in the last statement, see 39 Eng. Law & Eq. 28 (house of lords; 1857). Lord Cranworth says, in holding that the company is wholly distinct from its promoters and shareholders, that he is going on "no technicality, but what is the mere truth." 35 Eng. Law & Eq. 92; Preston v. Liverpool, etc., R. Co. (house of lords; 1855) Id. 375; same case below, De Gex & S. 743; on appeal in chancery, 1 De Gex, M. & G. 737. The cases before Lord Cottenham, and the courts from which appeal lay to his, where an attempt was temporarily made to override this doctrine in equity, are pointedly overruled. Williams v. St. George's Harbour Co., 30 Law T. 84.

Citizen shareholders, then, thus remotely connected with, and whose pecuniary interests are so subordinated by the statutes and general law to purposes undeniably the proper subjects of municipal aid, can constitute in principle no objection to its application.

In applying to this class of corporations, the familiar principle that contracts beyond charter powers are unlawful, the courts have been influenced by the consideration that their functions are public, and that the objection is taken, not for the shareholders, but in the interest of the government. See 1 Drew & S. 154; Attorney General v. Great Northern R. Co., 2 Law T. (N. S.) 653; Eastern Counties Ry. Co. v. Hawkes (house of lords) 35 Eng. Law & Eq. 8, 17. Lord Cranworth, after showing the public character of these corporations, says: "It is well settled that a railway company cannot devote any of its funds to other purposes, no matter howsoever beneficial it may be to shareholders." Colman v. Eastern Counties R. Co., 10 Beav. 1; Salomons v. Laing, 12 Beav. 339; Bagshaw v. Eastern Union R. Co., 7 Hare, 114, 7 Eng. Law & Eq. 505. In 16 Law & Eq. 180, are a few of the many modern English decisions on the subject. In Pearce v. Madison & I. R. Co., 21 How. [62 U. S.] 441, it is said that the public has an interest in this question, and the court takes pains to say that it cites the modern English cases for the purpose of showing this to be the ground of their judgment. There is no subject upon which decisions are more numerous. There are few state courts which have not repeatedly so ruled, and none more frequently and stringently than those of Michigan. The reason is always the same—the public inerest. Kent, Angell & Ames, Redfield, Pierce, Shelford, and all elementary writers, give the same reason for the rule. What is done ultra vires, is held void; if threatened, it is restrained at the suit of the attorney general, because it is a public offense to divert a fund dedicated by the law to a specified political use. And it is no palliation that, in the instance, the diversion is beneficial to shareholders. The public officer must obey the law. On the contrary, the miller or innkeeper may employ his money in any way he pleases not criminal or immoral. When a donation raised by taxation is given to an organization, thus being a part of and governed by the political power whose funds are thus absolutely and irrevocably bound to such public duties, not one of the objections which would arise if it were bestowed upon a private hotelkeeper has, it seems to us, any application.

It is intimated that if the cars of all other companies could enter upon and use the road, this, too, would make the difference between legality and unconstitutionality. Protesting again that we are utterly unable to see in this anything more than a mere mode of use, in reference to which the lawmaking power, beyond doubt, is the sole judge, as Judge Cooley, as an author, so clearly shows; nevertheless, we add that this criticism also, we think, is as unfounded in fact as the former one—that the public had "no voice" in their management. The general law already provided for crossings and connections, and for compelling both if the corporations refuse them. It is an irresistible implication from the statute that the loaded cars of other roads shall be received and transported. In two instances the laws expressly compel it in this state. That under the general law this may be done in all cases is certain, and it is equally certain that it will be enforced by special provisions if the unenlightened conduct of these public agents throw impediments in the way of the very best possible mode for public transit or travel. To-day the cars of half the companies in this state are largely off their own roads unloading in the distant depots of the country. Thus far, this plainly implied statutory duty is being satisfactorily performed from the absence of all temptation to neglect it. But the law already forces the companies to prepare for the duty by suffering connections to be made. Can it be said with reason that the municipal aid law is unconstitutional beyond all reasonable doubt, because the legislature, having commanded the duty, leaves it unregulated, only because it believes the pres-

ent condition better secures every public interest?

The rule laid down includes every similar corporation in the state. There are three great public land grant roads in Michigan. They have been mainly built by donations from the national domain. The state of Michigan acted as trustee in the administration of the fund, and still continues a board of public officers, and imposes much official action with reference to it upon its governor. Extra taxation and duties are demanded in consideration of the selection of the donees by the state. The law creating them is subject to amendment, and they have been largely aided by municipal donations. Corporations thus created for great national purposes, subsidized by the national government through the sovereign state, as its agent and trustee; created by law at the public expense, under the guardianship of high political officers, cannot, we respectfully submit, without an extraordinary and novel use of common terms, be called "strictly private," and not to be distinguished in this regard from a mill or country inn. We submit, also, that the voice and control which the government retains in the subject of this taxation greatly exceeds that secured in other familiar instances, the rectitude of which has never been challenged, and which remains uncriticised by the Michigan court. It is, therefore, not only a public purpose, but the instrumentality of its accomplishment is most fully controlled by practical governmental supervision. If, therefore, the novel limitation set up in People v. Salem were true—if, as we cannot suppose, the constitution of Michigan forbids the execution of a clearly public purpose through private agencies—we do not think the fact that citizens own the shares is sufficient to bring these corporations within the rule.

In the light of these familiar doctrines, and the character of these companies, as before said, we shall the better appreciate the extent and force of the rulings in Michigan which had so fully settled the law of that state in conformity with the old maxims of American jurisprudence, in disregard of which People v. Salem has been decided.

In the case of Detroit & H. P. R. Co. v. Fisher, 4 Mich. 37, the statute under consideration gave to a company, all the shares in which were owned by citizens, the right to take and use for a plank road the public highway. The constitutional question was raised, and counsel cited the judgments of other states, where the same rights had been extended to turnpikes and other similar companies. The court sustained the power as it had previously done in Attorney General v. Detroit & E. P. R. Co., 2 Mich. 138. In neither of these cases was any compensation made to the public. Two other such charters were granted in the state. The latter case was affirmed in City of Detroit v. Detroit & E. P. R. Co., 12 Mich. 333. We can discover no difference in principle between these judgments and the case before the court in People v. Salem. That the roads were in the hands of corporations whose shares were owned by citizens, was not deemed an objection. In People v. Board of State Auditors, 9 Mich. 327, it was decided that a donation to salt manufacturers was constitutional, although the property was wholly owned by individuals, and the government retained no control over the amount or duration of the manufacture. It was said that as to salt made before the passage of the repealing act, the right could not be divested. In East Saginaw Manuf'g Co. v. City of East Saginaw, 19 Mich. 259, this case is affirmed. At page 275, Cooley, J., for the court, says: "It was a bounty law to encourage the manufacture of salt, and when this was earned it became a vested right, and we fully agree with 9 Mich. 327." In this view we all concur. The first of these latter judgments necessarily decided the constitutionality of taxation for aid and donations to a "strictly private business, in which the public had no voice." People v. Salem disregarded them. The same questions must now be decided differently if that judgment is adhered to. An earlier and equally pointed and still more literally applicable case is that of Swan v. Williams, 2 Mich. 427. It was objected at the bar that a railroad company, whose shares were all owned by citizens, could not constitutionally condemn property, as it was not for public use. It was held not to be a strictly private corporation, but that it held the land it condemned, and all its rights and franchises, in trust for the public. The precise point decided by it was, in 20 Mich., expressly and definitely ruled the other way. The objection is, that money given for the use of such a company is not a public but a private use. That case overruled the identical objection, and in pointed terms asserted that it was public. A more familiar truth cannot be asserted than that there are numerous subjects of such a private and personal nature that they would not sustain the right of seizing private property as for public use, which, at the same time, are among the familiar and conceded objects of taxation. When you have shown that an object is so far public as to authorize the former, you have exceeded the necessities of the latter. Swan v. Williams not only is conclusive of this case, but goes quite beyond it in the required legal direction. It is needless to refer to the familiar class of cases where the doctrines of Swan v. Williams have been assumed to be law by the bar and bench during the twenty years that they have been administered without question in Michigan. They are numerous.

The practical legislative and departmental action in Michigan is equally conclusive.

Before considering it, we will refer to a few leading judgments and authors to show that upon principle it ought to have influenced the state decision, and must, as a matter of fixed law, guide our own.

It is an axiom in American constitutional law that such departmental and legislative action will conclude the courts in all cases where any possible interpretation can uphold actual investments and contracts. In an early case in the United States court, Stewart v. Laird, 1 Wheat. [14 U. S.] 351, it is said: "It is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. This practical exposition is too obstinate to be shaken or controlled. Of course, the question is at rest, and ought not to be disturbed." In the case of Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 621, Judge Story, speaking of a law, the constitutionality of which had been acquiesced in for many years, said: "Such uniform recognition would entitle it to be considered at rest, unless the interpretation of the constitution is to be delivered over to interminable doubt throughout the whole progress of legislative and governmental operations." Lord Eldon, in 2 Brod. & B. 598, says: "The most enlightened judges who ever sat in Westminster Hall always gave the greatest weight to what obtained in practice." See, also, Bennett v. Watson, 3 Maule & S. 1; 7 Durn. & E. [7 Term R.] 743. In Calton v. Bragg, 15 East, 223, Lord Ellenborough declared "it is not only from decided cases where the point has been raised, upon argument, but also from the * * * practice * * * without objection made, that we collect the rules of law." 1 Turn. & R. 87; 3 Russ. 428; 10 Ves. 272; 3 Bos. & P. 547; [Surgett v. Lapice] 8 How. [49 U. S.] 68; [Bissell v. Penrose] 8 How. [49 U. S.] 338; [Briscoe v. Bank of the Commonwealth of Kentucky] 11 Pet. [36 U. S.] 319; [The Aurora v. United States] 7 Cranch [11 U. S.] 383; Ames v. Howard [Case No. 326]; [M'Keen v. Delancy] 5 Cranch [9 U. S.] 22; 2 Mass. 475; 16 Ohio, 599; 1 Hopk. Ch. 245; and 1 Serg. & R. 105,—are all pointed in applying this rule. In 2 Cow. 552, it is said: "Upon any sound principle of government, the citizen has a right to rely upon the action of the sovereignty." See, also [Martin v. Hunter] 1 Wheat. [14 U. S.] 351; [Cohens v. Virginia] 6 Wheat. [19 U. S.] 418; [Bank of U. S. v. Halstead] 10 Wheat. [23 U. S.] 63; [Ogden v. Saunders] 12 Wheat. [25 U. S.] 290, and numerous other cases from the state and federal courts, cited in Cooley, Const. Lim. at page 69, which, so far as the case before us is concerned, are equally decisive in protecting what has been done in reliance upon practice. They all say in case of doubt it is conclusive. They fully sustain the rule quoted from one of them by Judge Cooley, and by him announced as the fair result of them

all, as follows: "If the question involved is really one of doubt, the force of the legislative judgment, especially in view of the injurious consequences that may result from disregarding it, is fairly entitled to turn the scale in the judicial mind." This he lays down, after full review, as a general canon of interpretation for our American constitutions.

Michigan has most fully adopted this salutary rule. Its courts have said, not only that in no case of doubt should a court overrule the judgment of the legislature, but have added the additional reason we are now discussing in its fullest application. In Clark v. Mowyer, 5 Mich. 468, most of these judgments, and others kindred to them, are cited and approved. And see, also, 14 Mich. 67. ·

So obligatory is this rule deemed upon courts, when contracts have been made in good faith, or when action has taken place to overturn, which would result in great evils, that when they could see no possible interpretation of the words of the constitution, or of statutes, to warrant what has been done, they simply declare that the fundamental law has been violated, as an indication of what they would hold in future cases, refusing to apply the rule to the destruction of what had been done in reliance upon the public acquiescence. In Ohio, in clear violation of its constitution, the legislature, usurping judicial functions, granted divorces. In Bingham v. Miller, 17 Ohio, 446, the supreme court, in refusing to declare marriages void, say: "We have said enough to vindicate the constitution, and believe the evil will cease." Had it not ceased, they would have decided a future case differently. In Illinois a similar principle was applied to the creation of railroad corporations. In Johnson v. Joliet & C. R. Co., 23 Ill. 207, the court said it was too late to make the objection. Property had been vested upon the action of the legislature. New York, Pennsylvania, Massachusetts and other courts, following the English rule, have acted upon a like principle. It is applied in every department of the law, and guides our private intercourse and business life. Courts read contracts as parties have construed and acted upon them. Licenses are implied from the toleration of persons and the public, and the most substantial and valuable rights are based upon them. There are no conditions more loudly calling for a full application of this rule than those attending the interpretation of organic laws. None have, in fact, so frequently invoked it in actual judgment.

That the legislative, political and practical business action of Michigan brings this case far, very far, within the limits of this kindly and protective rule, the following citations show: Sess. Laws 1838, pp. 101, 108, 252, 259, by which bounties were given for the manufacture of sugar from beets, for the manufacture of silk, and authorizing loans of the public money for the benefit of certain

railroad companies. In 1848, also, a law was passed, authorizing the Detroit & Erin Plank Road Company to take possession of the Fort Gratiot road and construct a plank road thereon, and other acts of a similar nature were passed in the same year. See Sess. Laws 1848, p. 382. In 1848 state lands were given for the erection of churches to such denominations as chose to apply for them. Laws 1848, p. 348. In 1850, a township was authorized to take stock in a plank road company. Laws 1850, p. 336. In 1853 (Sess. Laws, p. 125), the county of Saginaw was authorized to loan its bonds .to a plank road company. In 1855 (Laws 1855, p. 276), certain lots in Lansing were given to churches. In 1861 (Laws 1861, p. 283), twenty-five thousand acres of state swamp lands were given to the German-American Seminary of Detroit. To all these laws, fully acted upon, no word of objection was heard until the unexpected judgment in People v. Salem.

It is a doctrine to which we know of no exceptions, that where one government adopts from another a constitutional clause or a statute, or re-enacts an old one from its own code, it is presumed that the practical and judicial construction which it had before received is also adopted. It would require the most marked and extraordinary conditions to exclude the operation of this principle. The public is quite warranted in presuming that this well-known canon of construction will not be disregarded. See Bemis v. Becker, 1 Kan. 226; Stebbins v. Guthrie, 4 Kan. 353; Pennock v. Dialogue, 2 Pet. [27 U. S.] 1; Campbell v. Quinlin, 4 Ill. 288; Rigg v. Wilton, 13 Ill. 19; Tyler v. Tyler, 19 Ill. 151; Adams v. Field, 21 Vt. 256; State v. Macon Co. Court, 41 Mo. 453; Draper v. Emerson, 22 Wis. 247,—which are but illustrations from an extensive list.

In 1850, when the constitution of Michigan was adopted, decisions establishing the validity of municipal aid to railroads had been made in Connecticut, Kentucky, Pennsylvania and Virginia, by the highest courts of these states, respectively, without one opposing decision. And in the following states, as shown by the briefs of counsel, statutes authorizing municipal aid to private corporations had been passed under. constitutions, all of which were like that of Michigan, so far as is material to the decision in People v. Salem.

In Connecticut, Laws 1837, p. 18; 1838, p. 45; 1842, p. 54. In Georgia, Laws 1838, p. 66. In Kentucky, Laws 1833, pp. 526, 543, 643; 1834, pp. 398, 285; 1836–37, p. 341; 1837 –38, p. 98; 1838–39, p. 337; 1848–49, p. 212; 1849–50, pp. 285, 403; In Maine, Laws 1848, p. 198; 1849, p. 351; 1850, pp. 461, 530. In Missouri, Laws 1847, p. 348; 1849, p. 159. In Mississippi, Laws 1848, p. 333. In Illinois, Laws 1849, p. 33. In Indiana, Laws 1842, p. 3; 1850, p. 149. In New York, Laws 1837, pp. 457, 341; 1839, p. 313; 1841, p. 329. In South Carolina. Laws 1848, p. 542. In Ohio,

Laws ·1838–39, pp. 128, 349, 343, 367; 1841– 42, p. 100; 1844–45, pp. 232, 109, 46, 403; 1843–44, p. 103; 1845–46, private, pp. 109, 218, 250; 1845–46, general, pp. 167, 192, 250; 1846–47, pp. 56, 65, 87, 95. Numerous like· acts are found in the laws of each year until in 1852, when the new constitution went into effect forbidding both state and municipal aid. In Pennsylvania, Laws 1848, p. 273; 1849, p. 360. In Tennessee, Laws 1847–48, p. 58. In Virginia, Laws 1847–48, p. 184. Laws 1848– 49, 1849–50, and 1850–51, are crowded ·with acts authorizing subscriptions to the stock· of· turnpike and railroad companies by municipalities and by the state. In Michigan, Laws 1850, p. 336. In most of these states it was customary to grant state aid as well as municipal aid to corporations engaged in internal improvements. In Alabama, state aid was· granted (Laws 1843–44, p. 136), but so far as we have ascertained, no municipal aid until 1851 (Laws 1851–52, p. 218). In Maryland, state aid was granted (Laws 1836, c. 218, § 16;. Laws 1838, resolution 68). In North Carolina, state aid was granted (Laws 1844–45, p. 103; 1848–49, p. 138). In Delaware, state aid was granted (Laws 1843, p. 521; 1847, p. 137).

It would be no more extraordinary for a local court to go back of the old readings of· English statutes which have been adopted in this country, than at this day to rely upon the literal meaning of a well known clause in our organic law adopted from those of the· older states. The statutes of frauds, of uses and trusts, of limitations, and other familiar enactments, which so many states adopted literally, contained in their letter but slight information of the complex doctrines which the English judiciary has deduced from them. It would be little less than absurdity to go back to the words of those laws to learn what our American legislators meant when they adopted them. The rule is almost without exception that the legislature is presumed to enact, with the statutes themselves, their judicial and practical construction. An hundred unquestioned judgments so rule. With increased force and practical necessity is the doctrine demanded when a court is called upon to uphold or destroy the rights of innocent citizens who have relied upon the rectitude of governmental action.

The opinion in the Salem Case disregards another old and well settled rule limiting judicial authority.

The undoubted opinion of the American judiciary and the bar is that a court cannot declare a statute invalid unless it is prohibited by some express provision of the constitution, or by necessary implication; and that its repugnance to justice, to what the court deemed sound policy, or to general principles of jurisprudence· furnishes no ground for a refusal to enforce it. ·

In Cooley, Const. Lim. (page 87 et seq.) the learned judge, when speaking as an author, says: "There are two fundamental rules by which to measure legislative authority in the

states." The first is that "the people must be understood to have conferred the full and complete power as it rests in the sovereign power of any country, subject only to such restrictions as they have seen fit to impose. The legislature. is not a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion." He quotes largely from Denio, C. J., in (People v. Draper, 15 N. Y. 543), and from Thorpe v. Railroad Co., 27 Vt. 142, where Redfield, J., said: "The American legislatures have the same unlimited powers as the British parliament, except where restrained by written constitutions. This must be conceded as a fundamental principle in the political organization of the American states. We cannot comprehend how, upon principle, it should be otherwise. The people possess all legislative power. They have committed it, in the most unlimited manner, to the legislature."

At page 159, and onward, he ·discusses the question, and after illustrating, by many citations, the carefulness and delicacy with which the courts have dealt with legislative enactments, he criticises the dicta which intimate a power to annul a law because it is unjust, or "at war with the social compact." He says, at page 168: "The rule on this subject appears to be that, except when the constitution has imposed limits upon the legislative power. it must be considered practically absolute, whether it operates according to natural justice or not." To this rule he cites over fifty adjudications. They are from nearly every state in the Union, including that of Michigan, and from the national court. After saying that the courts have no power to condemn a law because it is against what may be deemed the spirit of the constitution and the principles of republican government, unless in violation of written limitations, he sums up a farther review of adjudications by saying: "The accepted theory is: 'In every sovereign state there is an absolute, an uncontrolled power of legislation. In England, this rests with parliament; in America,·with the people as an organized ·body politic.' Granting this power in general terms, they must be understood to grant the whole legislative power which they possessed, except so far as they imposed· restrictions." At page 73, he adds: "We have before said, a ·statute cannot be declared void because opposed to some supposed general intent or spirit which it is thought pervades or lies concealed in the constitution, but unexpressed, or because it violates fundamental principles, if it was passed in the exercise of a power which the constitution confers." That the federal constitution is a grant only of specific legislative powers, while, on the contrary, that of the state confers all powers except as limited, is explained, and numerous judgments in Michigan and elsewhere, are cited to this familiar distinction. He ably explains and amply verifies by citations that all general grants of

power, and especially that of legislation, are unlimited, unless expressly restricted, and demonstrates, as clearly as history, reason and authority can demonstrate, that, according to the well-known and universally relied upon elementary principles of American jurisprudence, a general, unlimited power ·of legislation, such as is contained in the Michigan constitution, does include, beyond all possible doubt, the power of passing a law authorizing municipalities to exercise a right so common as that of granting aid to railroad companies. He is the most recent and full commentator upon this precise question, and faithfully condenses the numerous and concurring judgments which deny the extraordinary judicial power exercised in People v. Salem.

The peculiar jurisprudence of Michigan laid no foundation for the judge sitting on its bench to disregard the doctrines so fully announced by the author. The contrary will most fully appear. In Green v. Graves, 1 Doug. (Mich.) 352, it is said: "We adhere to the rule sanctioned by the supreme court of the United States, that to authorize the judiciary to pronounce a law unconstitutional, the conflict between it and the constitution must be palpable and established beyond all reasonable doubt." See, also, Scott v. Smart's Ex'rs, 1 Mich. 306; People v. Gallagher, 4 Mich. 253; Sears v. Cottrell, 5 Mich. 254, which are all equally pointed. In Tyler v. People, 8 Mich. 333, it is said: "We should be able to lay our finger on the part of the constitution violated, and the infraction should be clear beyond reasonable doubt." And see, to the same effect, People v. Mahaney, 13 Mich. 501. In People v. Blodgett, 13 Mich. 151, it is said that "without express limitations the legislative power would have been as absolute and unlimited as that of the parliament of England, subject only to the constitution of the United States."

In a state where the judiciary have said that all laws shall be administered, and all contracts made under them enforced, unless we can "lay our fingers on the constitutional provisions violated," and perceive the conflict so plainly that there can be "no reasonable doubt" of its existence; when this identical legislation has been exercised for half a century by nearly every staté in the Union; when the courts of last resort of some twenty-four states have solemnly adjudicated its lawfulness, and the national courts, having a coördinate power in large classes of cases, have condemned a contrary doctrine; and when Michigan, ever since its organization, has over and over again passed and enforced without question similar statutes, it seems to us but a mockery of precedent—a rejection of all the sources from which alone a lawyer can learn the law—it is rendering worse than useless, all our libraries and professional diligence, which can only mislead by their teachings, if, in these conditions, a majority of a court will assume to say that it has no doubt whatever that

all this practical action is a mistake and a blunder, and that all this judicial decision is ignorance and misapprehension. What are the sources of that certainty without which it has so often conceded that it had no authority to annul a statute? No new facts have occurred, and no new views of any kind are taken, but arguments rejected for nearly half a century by hundreds of learned and experienced judges are, without the slightest addition, reproduced. There are certain terms of fixed technical signification, used also in other senses, in common use and metaphysical inquiry—"discretion," "reasonable doubt," "probable cause," "malice," "notice," and the long list of words and phrases, to comprehend which demands the careful study of a whole department of the law. They are all, from time to time, grossly misapplied in judgment by adopting the popular instead of the legal signification. The only sense in which judges have a right to use the term "reasonable doubt," as to the existence of a legal rule, has little reference to its rectitude or its origin. Law becomes such, far oftener than otherwise, by simple administration and successive decisions. And when we look to the mandatory sources of legal judgment, and to those principles upon which the citizen has a right to repose, and see the array of convincing evidence in favor of the validity of the law, the existence of a judicial opinion of its unconstitutionality, beyond all "reasonable doubt," is logically excluded.

The unexpected length of this opinion, due mainly to the impossibility of commanding time for its condensation, forbids a detailed examination of the three additional objections urged in People v. State Treasurer [23 Mich. 499].

It will occur readily that they are all sufficiently answered by the citations and arguments already made. They have been raised and overruled again and again, and unless history cannot settle, unless, in the language of the supreme court, in Prigg's Case [16 Pet. (41 U. S.) 621] "our constitutions are to be handed over to interminable controversy during the whole course of governmental operations," such objections should not at this late day be again urged.

It is said such taxation is not "due process of law," which the constitution demands. This clause has no reference whatever to the objects and purposes of a statute, but to the mode in which rights are ascertained. It is right to decide that A shall pay his debt to B, and to punish arson and larceny. But it would not be so to enact directly that the debt should be paid without affording full trial and defense, or to punish the person for crime without confronting him with his witness. In such cases the process of law would be wanting. To those and analogous instances only has this clause, old as Magna Charta, ever been deemed applicable. It is its well settled meaning in Michigan.

In Sears v. Cottrell, 5 Mich. 251, Manning, J., delivering the opinion of the court, says: "The words 'due process of law' mean the law of the land, and are so to be understood in the constitution. By the 'law of the land' we understand laws that are general in their operation and that affect the rights of all alike, and not a special act of the legislature, passed to affect the rights of an individual against his will, and in a way in which the same rights of other persons are not affected by existing laws." A similar construction of this phrase is given in Brooks v. McIntyre, 4 Mich. 320.

The objection here is not that due process is wanting, but that the purposes of the taxation are unconstitutional, no matter by whatever mode or plenary form it is assessed. The clause invoked, so far as we can after much reflection perceive, has no application to the objection made. In a loose and untechnical sense, whatever is done in disregard of the constitution is without due legal proceedings. But so interpreted, it becomes meaningless, and declares only that the constitution shall not be violated, remitting us in each violation to some other clause upon which to declare invalid what has been enacted. It is not so unimportant a feature in our American constitutions. It stands there to demand, after all other provisions are complied with, and legislation and public administration are confined to the proper objects and subjects of law, and substantial rights of person and property are all secured, that the processes for ascertaining them shall be such in their substantial features as the common law of England and this country secured. See Hoboken Land Co. v. Murray, 18 How. [59 U. S.] 272; Sears v. Cottrell, 5 Mich. 251.

That the assessment is not, under the local constitution, "uniform taxation," is also said.

The objection is that "all the towns along the road do not contribute" upon some basis fixed by law. As now assessed, the taxing districts are limited to entire towns and cities. Is there constitutional power in the Michigan legislature to prescribe districts for the purpose of local taxation? And if so, what are its limitations?

The best judicial answer is a reference to a long list of judgments in Michigan, concurring with a still longer list in other states, affirming that, in this regard, its discretion is unlimited, and that the courts cannot control it. In Woodbridge v. City of Detroit, 8 Mich. 274, affirming only what had many years before been as fully decided, Judge Campbell says:

"And there is no restriction upon the legislature in defining the size of districts. Our road districts are instances of this. And if a charge is made on a uniform rule within any prescribed district, there can be no very good reason for objecting to it because the district is large or small, if the rest of the city is made to bear its own local burdens on

a substantially similar basis." Judge Christiancy, in the same case, on page 308, speaks of the "acknowledged power of the legislature to establish assessment districts for local purposes." These views are fully sustained by the recent cases of Motz v. City of Detroit, 18 Mich. 495, and Hoyt v. East Saginaw, 19 Mich. 39; and see, also, Williams v. Mayor, 2 Mich. 560. Unless, then, there is in the nature of the road aided some characteristic distinguishing it from the objects of other local assessments, these judgments are quite conclusive. And we suggest again, what may be unnecessary, that the mode of assessing the tax is not invalidated, and the want of constitutional uniformity is not proven by asserting the private nature of the enterprise. The present objection proceeds upon a full concession of the rightfulness of the assessment, if it be, within the meaning of the constitution, made with uniformity within a district which it is lawful for the legislature to create. This question never depends upon the territorial extent of the subject, a part of which, on account of local benefit, is aided or improved by the tax. A harbor, though a part of the lake or ocean, used by the citizens of a municipality, and also by other parties, and a highway leading through and from one city to distant points, are the constitutional subjects of aid by local assessments, without extending the districts throughout the entire length of their common use. The road, for the purpose of taxation, is divisible even into streets and blocks if such is the legislative direction. A contrary idea is wholly novel, and in this form would be rejected by the learned court, whose objection, carried to its inevitable results, necessarily denies the rule. The sole justification for all these local assessments is the real or legally assumed local benefit of the improvement. If that is declared by the legislature, or ascertained by commissioners or juries, or by the citizens in public meeting to equal the local tax, it is absolutely conclusive upon the courts. The mode of its ascertainment, the size of the district, or the character of the improvements, has been over and over again decided to be entirely beyond judicial cognizance. That other districts and citizens are also interested, and did not contribute, has been in manifold forms brought to the attention of the courts as grounds for attacking the frequently hard and severe assessments in our cities for paving, grading and sidewalks. The answer is uniform—equality is impossible. The nature of the right exercised forbids it. It is enough that a party is benefited in legal contemplation to the amount of his tax. It is immaterial that the performance of his duty benefits others. Nor, say the courts, can we hear proof that, in fact, the assessment exceeds all increased value to his land. This is a legislative question which courts cannot control. More familiar truisms than these we do not

know. They are nowhere better settled than in Michigan. And still, if we understand this objection as made in the last case of People v. State Treasurer, the decision in it ignores them all, and insists that some undefined length of road must be selected by law, and each town along it compelled to contribute upon the same basis. It seems to be assumed that "the road," the towns along which should all be contributors, is that which some one company constructs and controls. But there may be, and in this state there are, already several companies organized to build a continuous line across the state. These may be consolidated into a single road and corporation. During construction, the road of each company may be divided into sections for the purpose of assessment on stock and control, and become quasi corporations. All, again, under the same general law, may be consolidated with corporations and roads in other states, and become indivisible portions, like other common highways, of great national thoroughfares.

Every consideration, which sustains the decisions in reference to streets and highways, is applicable here. The road may be from one state to another—it may be national; but if the legislature declares there is a local benefit, no matter how many others may be also benefited, the assessment is constitutional. It often happens that one town is actually—in the estimation of its citizens at least—injured by a new road creating new business centers in rivalry of its own. Would it be politic or sensible legislation to force it to contribute upon a legislative arbitrary decision that it was benefited? A more secure and satisfactory mode than the decision of its citizens cannot be devised. Again, in some localities the road will so undeniably pay its projectors, or the necessity of traversing it in order to reach some point beyond it or to connect existing lines, may be such that the construction is certain, and there is no need of aid, or suggestion of aid, in order to secure it. Shall such towns be forced, without any necessity, to contribute because another somewhat off the line, in order to deflect the road in its course through its limits, desires to compensate its projectors for this change in the plans? The theory is not to force all to contribute alike, but far on the other extreme. The very essence of this principle is to suffer each vicinity, by the smallest payment possible, to secure the benefit. Each locality judges for itself, and buys at the smallest price.

It will not be overlooked that in large numbers of the cases decided in other states this novel objection might just as well have been raised; and these cases are, upon well-known principles, precedents against it. The constitutions of Virginia, Louisiana, Indiana, Texas, Wisconsin and California contain similar clauses. It did not occur to courts

or counsel to raise such a question until since the Michigan decision. Counsel have presented it in Indiana, where it has been readily overruled. See Lafayette M. & B. R. Co. v. Geiger [34 Ind. 185].

The provisions which forbid the state to engage in works of internal improvement are also relied on. As said in reference to all other portions of these judgments, so this last reason also should have been withheld in view of numerous decisions declaring it untenable. Similar clauses are found in the constitutions of Ohio, Kentucky, Iowa, Kansas, Illinois, California, New York, Texas, Wisconsin, and Louisiana, and the courts of these states have, after elaborate arguments, uniformly decided that prohibitions upon the state are not such upon the municipalities.

Cass v. Dillon, 2 Ohio St. 607; City of New Orleans v. Graihle, 9 La. Ann. 561; Slack v. Maysville & L. R. Co., 13 B. Mon. 1; Prettyman v. Supervisors of Tazewell Co., 19 Ill. 406; Clarke v. City of Rochester, 24 Barb. 446; Clark v. City of Janesville, 10 Wis. 136; Bushnell v. Beloit, Id. 195; Pattison v. Board of Supervisors of Yuba Co. 13 Cal. 175; Dubuque Co. v. Dubuque & P. R. Co., 4 G. Greene (Iowa) 1; Stewart v. Board of Supervisors of Polk Co., 30 Iowa, 15; Commissioners of Leavenworth Co. v. Miller, Kansas, not yet reported, except in pamphlet [7 Kan. 479].

There is no contrary decision. The question ought to be considered settled by these concurring judgments. The frequency with which this power had been exercised before the adoption of the Michigan constitution, peremptorily forbids the legal presumption that the convention intended to prohibit it by mere implication. At that time, municipal aid to private corporations had been authorized by the legislatures of fifteen states, including Michigan, viz.: Connecticut, Georgia, Kentucky, Maine, Missouri, Mississippi, Illinois, Indiana, New York, South Carolina, Ohio, Pennsylvania, Tennessee and Virginia. The legislative action of the state is equally forcible to forbid such an interpretation. Immediately before and after its adoption, this power was exercised without question.

In 1850, a statute authorized a township to aid a plank road company. Some of the members of this legislature were also members of the convention, which subsequently in the same year formed the constitution.

The legislature of 1853 (Sess. Laws, p. 125), some of whose members were in the convention, authorized a county to loan its bonds to a plank road company. This was amended in 1855. These laws are referred to as strong cotemporaneous action only. Our previous citations show this is but a small portion of the similar legislation by this state.

At this time, two similar restrictions in Kentucky and Illinois had been decided not to interfere with such aid by municipalities.

The motives which produced this inhibition in the Michigan constitution we do not think are those supposed by the learned supreme court. That local municipalities should not aid such works, provided they were controlled by individuals, was never intended. A contrary and unquestioned action existed elsewhere and in Michigan, and was continued immediately after and ever since its adoption without question or doubt. It was their aid and management by the state as a government, the corruption which there and elsewhere ever attended the letting of contracts, the purchase of property, the placing of bonds and the control of funds, which constituted the sole objection. That they could be better managed by private shareholders was undoubtedly decided, but there is in this no assertion or the most distant implication that they were not deemed of high public importance, or that the municipalities of Michigan should be deprived of rights exercised then and since, not only by them, but by those of nearly every state in the Union. It is most certain, judicially we are compelled to say, that had this been the intention, it would have been said in plain terms. It would not have been left to implication in a system of laws, which so unqualifiedly forbade the courts to create such a distinction without an express inhibition of the tax.

No portion of the views expressed by the supreme court of Michigan seems to us less warranted than the assertion of a growing judicial and professional dissatisfaction with the numerous decisions, state and national, which hold municipal aid to private corporations constitutional. We are at a loss to imagine the source of such an impression. To the policy of municipal aid to internal improvements there has always existed a spirited opposition. Most objects of public taxation at all removed from the expenses of ordinary administration usually call for much criticism. This one, peculiarly subject to spasmodic action and local excess, has provoked its full share, and the legislative contests—the only constitutional occasion we submit for such discussions—illustrate the violent difference of political opinion which leading citizens entertain in regard to it. But so far from the profession or the public condemning the American judiciary for its consistent and stable course, or looking to it for relief when the policy of such aid was condemned, they have conceded that the whole subject was one for new governmental regulation only, and have accordingly inserted express prohibitions in several modern constitutions. The few judgments in Wisconsin and Iowa, which assumed to disregard the established jurisprudence of the country, did so with an acknowledgment of their own revolutionary character. The latter

court has already receded from its exceptional position. Prior to the determination of People v. Salem, the supreme court of the United States, with all the learning on this subject before it, in one of the most spirited condemnations of local judgments ever uttered by it, had refused to follow a series of decisions in Iowa exactly like that now before us. Such action on its part is never taken save when it is entirely satisfied with the contrary rulings, and that they were in accordance with "the principles of American jurisprudence." So far from there being, during the last few years, a growing judicial dissatisfaction, not only the statutes and the action under them, but the decisions of courts sustaining them, were multiplying with increased rapidity. In the late constitutional convention of Michigan, one of its leading and most learned members, an ex-attorney general of the state, after a thorough examination for the purposes of the opinion, said, in debate, that although he strongly disapproved the political policy of municipal aid to railroads, and recommended its constitutional restriction, the existence of such a legislative power, after so many concurring judgments, "must be considered as settled law." The judges of both of the national district courts of Michigan were members of the convention. There was no dissent from this declaration of the law, nor any intimation that the judiciary could afford relief. Nearly all the leading members of the bar have thus advised, and there was no professional intimation that the character of those numerous rulings authorized the local court to disregard them. We speak with a very large familiarity with the condition of professional opinion upon this point, and we believe that since the organization of the state no single judgment has taken the legal mind with such unrelieved surprise as that from which we are now compelled to dissent.

The great misapprehension on this subject is strikingly illustrated by the fact that, within a few months after the promulgation of the opinion in People v. Salem, the highest courts of five states, with its reasonings before them, have refused to follow it. The judgments of few local courts in our country are of more influence than those of the supreme court of Michigan. Their general learning and character entitle them to the high reputation they have so unquestionably secured. If any judgments could have stimulated a general dissatisfaction into general dissent, that before us would have done so. But Vermont, Texas, California, Indiana and Kansas have all recently disregarded the rulings in the case of People v. Salem. We rejoice that if there may be doubt whether our decision administers the law correctly, there can be none that its results are such as the plainest justice requires.

A change is loudly demanded in our constitution, which shall in some degree limit the destructive effect of judicial interpretation upon contracts made by the citizens in reliance upon action of the sovereign power of the state. Without this, the list of cases already referred to where it was said that constitutional criticisms came too late, and those yielding blindly to practical construction with little reference to the clause construed, must be greatly lengthened. Without some organic remedy, the indications are that the courts, from the abundance of the law's technicalities, its presumptions of law when the proof of actual fact is excluded, its estoppels in pais when good faith closes the mouth of objection because the hand is full of another man's money, will deduce some rule which will enable them to declare an act unconstitutional and at the same time protect past transactions and an innocent community from the consequences of its invalidity. We think, indeed, that no greater step in the law's growth is now needed for that purpose than the one taken by the learned supreme court of Michigan in the repressive policy it deemed it its duty to enforce. And this, in its practical effect, is the whole scope of those decisions of the supreme court of the United States, which we now follow. There is no attempt to mould the institutions of the state in violation of the opinions of the local courts. The rule adopted is so narrowed in its application, and so respectful and kindly in its adaptation to the relations in which it is administered, that thus far, in our harmonious history, the power which upholds it has hardly attracted general attention. Resorted to only when the claims of good faith demand it, in each instance of its exercise all severe criticism is silenced.

Talcott's bonds, bought in reliance upon the sovereign action of the state, action taken in conformity with principles which the court of last resort in the nation had before their issue decided to be part of the national jurisprudence, are enforced. Should he, tomorrow, bring here other bonds, the steps to create which had been taken since the state judgments holding them invalid, he would be told that those judgments were not subject to criticism here; that this court would administer their doctrines, in all their results, wholly irrespective of our own opinions.

Nor will any conflict of jurisdiction result. When a subject has been finally decided by one tribunal it is res adjudicata, and the other will never rejudge it. If A's bonds are held invalid by a state tribunal, no other court will, in a second suit upon the same bonds, entertain the question. There can be no conflict if the citizens yield, as all those of Michigan undoubtedly will, a ready obedience to the judgment of each court, state or national, which has jurisdiction in the instance. There will be none of those anticipatory rulings, or of that retrospective legislation intended to cut off the power of

satisfying the final process of this court which has been so intelligently and promptly rendered abortive elsewhere.

WITHEY, District Judge. The opinion of the court pronounced by my Brother EMMONS, is complete and exhaustive of every question touched upon in the decision or discussed at the bar. I can add nothing which will strengthen that opinion; and yet, the methods by which I have reached conclusions embrace so very limited a range of discussion, and are so disregardful of many of the questions elaborately explained in the opinion of the court, as announced by the very learned circuit judge, as to induce me to state briefly the views I have taken in reaching a result in this cause. In saying this I am not to be understood as dissenting from the views expressed by my Brother EMMONS.

The supreme court of the United States have, in repeated decisions, settled the following propositions:

1st. That the United States courts will always respect the decisions of the state courts, and from the time they are made, will regard them as conclusive in all cases upon the construction of their own constitution and laws.

2d. But the courts of the United States will not give to the decisions of a state court a retroactive effect, and allow them to invalidate contracts entered into with citizens of other states, which, in the judgment of the courts of the United States, were lawfully made; and this principle applies to all contracts which come within the jurisdiction of these courts: Rowan v. Runnels, 5 How. [46 U. S.] 138; Ohio Life Ins. & Trust Co. v. Debolt, 16 How. [57 U. S.] 432. The doctrine of these cases has been frequently re-asserted.

3d. The broad proposition that the sound and true rule is, that if the contract, when made, was valid by the laws of the state, as expounded by all the departments of its government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature or decision of the state courts. Ohio Life Ins. & Trust Co. v. Debolt, supra; Gelpcke v. City of Dubuque, 1 Wall. [68 U. S.] 206.

4th. The supreme court of the United States has repeatedly held that, in the absence of some provision in the state constitution prohibiting it, the legislature has power to authorize municipalities to issue bonds in aid of railroads designed to benefit the public interests of the locality.

In Gelpcke v. City of Dubuque, 1 Wall. [68 U. S.] 203, the court say, "Where there is no defect of constitutional power, such legislation * * * is valid," citing Wilkinson v. Leland, 2 Pet. [27 U. S.] 626; Satterlee v. Matthewson, Id. 380; Baltimore & S. R. Co. v. Nesbit, 10 How. [51 U. S.] 395; White

Water Valley Canal Co. v. Vallette, 21 How. [62 U. S.] 425.

From the foregoing principles, firmly established by the repeated decisions of that judicial tribunal whose adjudications are a law unto this court, I proceed briefly to state my conclusions:

There is, confessedly, no provision of the state constitution expressly prohibiting legislation to authorize the issue of municipal aid in bonds. In the absence of the two decisions made since the bonds involved in this litigation were issued, I should not hesitate to hold that there is nothing in the organic law of the state which could be construed as prohibitory of that legislation. The opinion of the court in this case abundantly justifies this conclusion. But the state court having recently held, in one case at least, that there is want of legislative power to pass the law, because of the restraining effect of certain constitutional provisions, it is clear that as to all bonds issued after the date of such state decision the courts of the United States are bound to follow the state court, as the effect of its decision upon future issues is precisely as though the law had been repealed.

Nevertheless, as to bonds issued prior to the time of the state decision, in view of the principles already stated, a different rule prevails. If there had been a construction by all the departments of the state government in favor of the legislative power to pass such laws, and if that construction had been uniform, acted upon and acquiesced in by the public, then the state law would afford a valid basis for the contract made by the township of Pine Grove, represented by these bonds, and the rule of comity, which requires the federal courts to adopt the decisions of the state tribunals in reference to local laws, cannot be invoked to defeat a recovery here, nor can it be successfully asserted that the state decisions declaring the law invalid are, on any ground, binding on this court.

We are not called upon, by anything presented in this case, to decide whether, in the absence of such practical construction, under our view of the power of a legislature, in the absence of limitations in the organic law of the state, the federal tribunals must or must not hold all bonds issued prior to the state decisions valid.

Now, that there had been a construction by all departments of the state government in favor of the legislative power to enact the law authorizing municipalities to issue bonds to aid railroads, and that such construction had, up to the decision of the Salem Case by the state court, in 20 Mich., been uniform, acted upon and generally acquiesced in by the public, admits of no doubt. As far back as 1838, under the then constitution, which was silent on the subject of legislative power in this regard, a law was passed giving bounty for the manufacture of sugar

from beets; for the manufacture of silk, and authorizing loans of the public money for the benefit of railroad companies.

In 1850, a township was authorized to take stock in a plank road company. In 1853, a county was authorized to loan its bonds to a plank-road company. In 1865, the legislature authorized municipal aid to railroads. Following this, up to 1860, are numerous laws to authorize municipal aid. A law of 1859 gave a bounty of ten cents a bushel to salt manufacturing companies. I need not enumerate other instances to show the uniform assertion of the legislative department of its powers under the constitution.

In 1867 the attorney general of the state gave his opinion to the legislature of its power to pass laws authorizing municipal aid to railroads. All the governors of the state exercising executive functions when such laws were passed, except one, have approved those aid and bounty laws.

The supreme court of Michigan have, in more than one instance, decided questions which, by analogy and upon principle, have contributed largely to uphold and sanction such departmental construction. People v. Board of State Auditors (1861) 9 Mich. 327; East Saginaw Manuf'g Co. v. City of East Saginaw (1869) 19 Mich. 275.

In Twitchell v. Blodgett, 13 Mich. 127, it was, in substance, held, that to declare an act of the legislature unconstitutional there must be some express provision of the organic law which is violated, which must be pointed out, and the act must be so clearly in conflict with the provision as to be free from reasonable doubt.

I do not understand the state court to claim, in the recent cases, when the aid law was under consideration, that this law violates any express provision of the constitution.

But I have said enough to indicate the grounds upon which I hold the legislative, executive and judicial departments of the state to have upheld, prior to the decision of the Salem Case, the legislative power to pass the law in question. I shall take no time to show that the departmental construction has been acted upon and generally acquiesced in by the people of the state, by the legal profession, by bankers and by capitalists and financial men of every class. This is well known by all whose business interests have turned their attention to the subject.

I desire, however, to mention one exhibition of public opinion, as demonstrating what the general construction as to the power of the legislature has been. The constitutional convention of 1867, composed of one hundred members, from all parts of the state, and embracing gentlemen of intelligence from various pursuits and professions, had this subject under consideration. The journals of that body exhibited the fact that there was entire harmony of views; that, as

the constitution then stood, there was no restraint upon legislative action in allowing municipal aid to railroads. Hence, the only provision submitted by the convention to be voted on, as part of the proposed new constitution, was of limitation, to prevent the legislature authorizing a municipality to pledge its credit in aid of railroads beyond ten per cent. of its assessed valuation.

On the faith and stability of such a condition of public opinion, having its basis in a long series of legislative enactments, sanctioned by the executive branch, and, as I think, may be justly asserted, approved by the courts of justice of the state, the plaintiff became the owner of the bonds in this case, and in my opinion is entitled to judgment.

In the case of Taylor v. City of Battle Creek, LONGYEAR, District Judge, gave the following opinion:

On a full and careful consideration of the course of decision in the supreme court of the United States upon the question of the binding character of state decisions affecting questions arising under state statutes, I deduce the following rules, which I think are established by those decisions:

1st. That such state decisions will be adopted as rules of decision in the federal courts upon all questions and in all cases relative to transactions arising after such state decisions were made.

2d. That such state decisions will also be adopted as rules of decision in the federal courts in relation to transactions arising before such state decisions were made, in all cases in which such state decisions do not, in their effect and operation, in any manner conflict with the constitution of the United States or any act of congress.

3d. That when there is such conflict such state decisions are not adopted as rules of decision in the federal courts.

4th. That where a state statute by its terms constitutes in and of itself a contract or a basis of a contract by the state, or where such statute purports to authorize or empower municipalities, public or private corporations, or citizens to enter into contracts, and such contracts have been entered into in good faith, a decision of a state court afterward made, declaring such statute inoperative and void, or in any manner so construing such statute as to invalidate such contracts so previously entered into, or in any manner impairing their obligation, is prima facie in conflict with that provision of the constitution prohibiting a state from passing any law impairing the obligation of contracts. Art. 1, § 10.

5th. That in such cases as last above named, the federal courts will go behind the state court decision and inquire whether, in the state of the law as practically construed by the legislative, executive and judicial branches of the state government, at the

time the transactions in question took place, such transactions constitute a contract; and, if so, the federal courts will then enforce such contracts, independently and irrespectively of such state court decision.

I deduce these propositions from a long line of decisions of the supreme court, commencing with the case of Rowan v. Runnels, 5 How. [46 U. S.] 134, in 1847, and ending with Butz v. City of Muscatine, 8 Wall. [75 U. S.] 575, in 1869. These cases are so fully stated, commented upon and elucidated in the opinion of my Brother EMMONS, that it is quite unnecessary for me to notice them further.

That this case falls within the third, fourth and fifth propositions, I think, is clearly, fully and conclusively shown by the exhaustive opinions of · Judges EMMONS and WITHEY in the case of Talcott v. Pine Grove; and, therefore, without comment or argument of my own, I fully concur in their opinion and judgment, that the demurrer must be overruled.

In the case against the city of Port Huron, Judge LONGYEAR, on a subsequent day, ordered the demurrer to be overruled.

Talcott v. Pine Grove was affirmed in the United States supreme court, October term, 1873 [19 Wall. (86 U. S.) 666].